Archie K. BABSON and Victor J. Trial, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18410.

United States Court of Appeals Ninth Circuit.

April 8, 1964.

Rehearing Denied May 19, 1964.

Certiorari Denied June 22, 1964. See 84 S.Ct. 1920.

James W. Heyer, Denver, Colo., for appellant Babson.

James G. Follis, San Francisco, Cal., for appellant Trial.

Cecil F. Poole, U. S. Atty., Frederick J. Woelflen, and Jerrold Ladar, Asst. U. S. Attys., San Francisco, Cal., for appellee.

Before MERRILL, KOELSCH and BROWNING, Circuit Judges.

KOELSCH, Circuit Judge.

Archie K. Babson and Victor J. Trial were indicted (with several others) for using the mails to defraud and for conspiracy to do so. 18 U.S.C. §§ 1341, 371. The indictment contained a total of 21 counts; the first charged the defendants with a conspiracy and the remaining 20 charged them jointly with the commission of as many substantive offenses. Four of the substantive counts were dismissed on the Government's motion. The jury found Babson guilty on all remaining counts and Trial guilty of the conspiracy and two of the substantive counts, but not guilty as to any of the others. Both defendants appealed.

The fraudulent acts and the conspiracy charged against these defendants were in pursuance of the business of the United Jet Training Schools, which purportedly was to train persons for positions of responsibility with makers of jet airplane engines and with airlines.[1] In substance, the fraudulent scheme alleged in the indictment consisted of a plan to sell, by means of false promises and representa- tion, courses of study which the school offered covering the subjects of jet engine construction and maintenance.

On appeal both defendants commonly contend that the evidence is insufficient to sustain the verdicts. More particularly, they urge that there is no substantial proof (a) of any false representation, (b) of scienter, or (c) of a conspiracy. In addition, Trial, citing United States v. Corlin, 44 F.Supp. 940 (D.C.S.D.Cal. 1942), [see also Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L. Ed. 1557 (1946) and Isaacs v. United States, 301 F.2d 706, 713 (8th Cir. 1962), Cert. Den. 371 U.S. 818, 83 S.Ct. 32, 9 L. Ed.2d 58] argues that if the evidence failed to show the existence of a conspiracy, the judgment on the substantive counts must also be reversed because the indictment charged the defendants jointly, and not jointly and severally, with devising a single fraudulent scheme, and thus there is a fatal variance between the indictment and the proof.

However, a review of the record satisfies us that none of these contentions has merit. When the evidence is viewed in a light most favorable to the prosecution, and all conflicts in it are resolved against the defendants, the fact of their guilt as found by the jury becomes clearly evident. See United States v. Farago, 283 F.2d 772 (2d Cir. 1960); United States v. Mortimer, 118 F.2d 266 (2d Cir. 1941); Reistroffer v. United States, 258 F.2d 379, 395 (8th Cir. 1958); Galantas v. United States, 80 F.2d 15, 24 (8th Cir. 1935).

Babson started the school sometime in February, 1956, upon hearing of the need in the then fledgling jet aircraft industry for skilled mechanics and technicians. He had previously promoted a correspondence course in practical nursing and concluded that he could follow the same pattern in this new and lucrative field. He rented an office, hired one Porter to prepare a course for him, and immediately launched an intensive

---

1. The so-called school was also advertised variously as "United Jet Institute" and "United Jet Schools, Incorporated"; in this opinion it will be referred to simply as "The School."

selling compaign, in which he took a dominant role. He wrote and caused to be distributed by mail, and otherwise, a vast number of pamphlets, post cards and circulars, that were used to advertise the school. Some of the statements appearing in this printed matter were that the school was recognized and its training course was approved by major airlines and makers of jet engines; that upon successfully completing one of the courses a student became a qualified jet specialist or expert technician, and could reasonably expect to secure a position paying an annual salary of from $8,000 to $15,000; and that many graduates had done so. But there was evidence that these representations were untrue. For example, a representative of United Air Lines, one of the world's major commercial carriers by air, testified that the school had no standing with his company and that a graduate of the school at best would be hired as an apprentice mechanic at a pay rate of $2.25 per hour; that United's training program for jet mechanics extended over a four-year period and included not only academic study but actual shop work on the engines, under the supervision of experts, and that five years of such training was required for a supervisory position. Another witness, speaking for the Allison Division of General Motors, a principal maker of jet engines, gave testimony to the same effect. Likewise, it appears that the Civil Aeronautics Administration of the Federal Government, whose function it is to certify schools for airplane mechanics, required as a minimum for such certification that the school offer a course of 300 hours' actual engine work, and 1200 hours of study, and that Babson had been so informed. In addition, there were no graduates of the school when the statements first appeared and several of those, who later completed a course, testified that their diplomas were no help to them when looking for a job.

Babson also recruited a crew of salesmen whose function it was to visit prospects and secure their applications for enrollment. He conducted sales meetings at which he lectured the salesmen on sales methods, and assembled in a "sales kit" a selected lot of printed literature, including many of his own writings.

The vigor of the sales program, the attractiveness of what was offered, and the manner in which it was offered, is attested by the fact that some 1400 courses were sold. However, since anyone was eligible to apply for enrollment, without regard to the necessity of any basic qualifications, solicitation was indiscriminate and, while Babson testified that the policy of the school was to carefully screen applicants, the practice was clearly otherwise and very few were rejected.[2] With few exceptions, anyone with a "down payment" was acceptable as a student, and even the amount of such payment was as variable as the prospect's purse, ranging from $5.00 to several hundred dollars.

Trial had been acquainted with Babson for some time before the latter started the school. He was hired as a salesman in August, 1956, and actively engaged in that work until April, 1957, when he left to set up a correspondence school of his own. During this nine-month period he interviewed numerous prospects and succeeded in selling nearly 125 of the courses; his buyers included a greens' keeper for a golf course, an apprentice bricklayer, a restaurant owner, and a sausage packer; and in the process of making the sales, he used this sales kit and repeated, with some variations and additions of his own, many of the statements regarding the school that we have paraphrased earlier in this opinion.

Babson was no doubt entitled to some latitude in extolling the merits of his school, but this did not permit him to make representations concerning the school that were untrue, or with a reckless indifference as to whether they were true or false. West v. United States, 68 F.2d 96, 98 (10th Cir. 1933); United States v. Murdock, 290 U.S. 389, 394–395, 54 S.Ct. 223, 78 L.Ed. 381 (1933). Yet,

2. One notable instance was a policeman.

considering his position as founder and managing head of the school, it is apparent from the very nature of the representations that we have paraphrased that he did so.

■ The evidence relevant to Trial, although not as extensive or direct as that in the case against Babson, is likewise sufficient to support the finding of his guilt on the substantive counts. Trial, as has been mentioned earlier in this opinion, advised numerous prospective customers, including the two named in the substantive charges of which he was convicted, that the courses offered by the school were stepping-stones to well paid positions as supervisors of jet mechanics and specialists, and that persons who completed the courses would gain knowledge sufficient to qualify for such positions. These statements were part of his regular sales talk and were consistently made. Not only was the jury entitled to conclude that, in no event could a course produce the results claimed for it but even aside from that fact, no person, unless he was extraordinarily naive or deliberately blinded himself to reality, would honestly believe that those whose occupations were that of common laborers, or who possessed little or no formal education—and Trial made these assurances to such people—could be so speedily and easily transformed into skilled technicians. Certainly Trial was not so unsophisticated that the jury was obliged to determine that he made these representations in good faith, for he was a mature man with a college degree in architecture and some engineering experience; his employment had included a job with Pratt & Whitney, makers of airplane engines, in its small tool division. In sum, we are fully satisfied that Trial cannot be regarded as a credulous salesman who innocently reiterated fraudulent representations prescribed by his superior.

■ Defendants' attack on the evidence relating to conspiracy is adequately disposed of, adversely to them, by the following apt quotations:

"When a scheme to defraud is shared by two or more, it becomes a conspiracy; the rules of evidence are the same as where a conspiracy is charged (Robinson v. United States, 9 Cir., 33 F.2d 238); and the act of each party in furthering the common scheme is the act of all. Davis v. United States, 5 Cir., 12 F.2d 253. If one's intent is to defraud when he joins a dishonest scheme, he becomes a part of the scheme, although he may know nothing but his own share in the aggregate wrongdoing. Silkworth v. United States, 2 Cir., 10 F.2d 711. Formal agreement is not necessary, it being sufficient if there is an association in the purpose to defraud." Blue v. United States, 138 F.2d 351, 358 (6 Cir. 1943).

In speaking of the culpability of a salesman similarly circumstanced as Trial, the Eighth Circuit declared:

"If believed, it (i. e., the evidence) established that the gist of the scheme to defraud was brought to his knowledge and that he joined in with the principal schemers to accomplish their purposes. It is not necessary for the government to prove that he was one of those who originally devised the scheme. When he joined in the selling and the misrepresentations and deceptions, although in comparatively few instances, he brought himself within the provisions of the statute." Reistroffer v. United States, 258 F.2d 379, 395 (8th Cir. 1958).

■ The next assignment of error is grounded on the premise that the trial judge permitted the jury to publicly deliberate on its verdict. We are of course aware of the rule that a juror should not be subjected to "extraneous influences" which do or might in any degree coerce, embarrass, or otherwise hamper him in fulfilling his function as a judge of the evidence and finder of fact. A juror must be insulated against influences and protected from pressures that would tend to fetter him in the free exercise of his

own judgment. Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L. Ed. 435 (1956); Southern Pacific Co. v. Klinge, 65 F.2d 85 (10th Cir. 1933). To this end the law requires that all deliberations by a jury must be conducted in the utmost privacy. People v. Knapp, 42 Mich. 267, 3 N.W. 927; Crockett v. State, 52 Wis. 211, 8 N.W. 603; People v. Bruneman, 4 Cal.App.2d 75, 40 P.2d 891 (1935); Gainey v. People, 97 Ill. 270; Bowman v. State, 207 Ind. 358, 192 N.E. 755, 96 A.L.R. 522; State v. Aker, 54 Wash. 342, 103 P. 420. There is a considerable difference of judicial opinion whether a showing that a jury was intruded upon requires the granting of a new trial [People v. Knapp, supra], or merely gives rise to a presumption of prejudice which the prosecution may rebut [Graves v. Territory, 16 Okl. 538, 86 P. 521; Crockett v. State, supra]. From what was said in Remmer we would be inclined to say the latter view was the one to follow. But on this record the question is purely abstract and requires no expression of opinion. What occurred was that the jury, after the cause was submitted and following some seven hours of deliberation, requested to be and was returned into open court for additional instructions relating to the law of conspiracy. Upon answering the foreman's inquiry, the trial judge asked: "Now, is there anything further that you wish? You can confer among yourselves rather informally there, (that is, in the jury box)." To counsel's objection that such a discussion would constitute public deliberation, the judge replied: "They are conferring informally among themselves to see whether or not there is anything further they wish to ask the court." The jury was properly in the courtroom [Allis v. United States, 155 U.S. 117, 15 S.Ct. 36, 39 L.Ed. 91 (1894)] and we perceive nothing in what it did that amounted to deliberation of the kind that must be conducted in private.

■ The remaining points are based upon the trial court's action in instructing the jury prior to the arguments, contrary to Rule 30 of the Federal Rules of Criminal Procedure. The contention is that such a departure from the rule, although not objected to below, was so prejudicial as to constitute "plain error" within the purview of Rule 52(b) of said Rules. Further, it is urged that, even though that error alone did not operate to deprive the accused of a fair trial, the fact that additional instructions were given cooperated to do so. The burden of the argument is that the jury probably forgot the earlier instructions because (1) they were followed by the argument, and (2) the supplemental instructions probably led the jury to view as superseded those given earlier. We are unable to understand why the trial judge chose to ignore Rule 30, and certainly do not sanction that irregular procedure. It is essential to the administration of justice that a jury scrupulously follow the law as given to it by the judge, and to that end his instructions should be clear and firmly fixed in the mind of each juror. And if supplemental instructions are given, the better practice undoubtedly is for the judge to expressly advise the jury that such instructions constitute only a part of the entire charge and must be considered equally with the earlier ones. Here he refused to do this. In both instances the trial judge clearly erred, but in neither was the error of sufficient magnitude to warrant a reversal of the judgment. The most that appears is action premature by a few hours. And with reference to argument concerning the supplemental instructions, the answer is that they were not such as to create a false impression in the minds of the jurors, as was the instruction in Bland v. United States, 299 F.2d 105 (5th Cir. 1962) a case relied upon by appellants, nor did the judge comment on the evidence so as to necessitate his reminding the jury of its fact-finding function [Berger v. United States, 62 F.2d 438 (10th Cir. 1932)]. Moreover, the colloquy between him and the jury foreman dispels any inference that the jury believed it might or should disregard the earlier instructions.

Finding no reversible error, we affirm the judgment.