**UNITED STATES of America**

v.

**William SHEINER and Victor C. Piacentile also known as Victor Pease, Defendants.**

**No. 66 Cr. 501.**

United States District Court
S. D. New York.

Oct. 5, 1967.

Robert M. Morgenthau, U. S. Atty., Frank M. Tuerkheimer, Asst. U. S. Atty., New York City, for plaintiff.

Herbert S. Siegal, New York City, for defendants.

ZAMPANO, District Judge.

## MEMORANDUM OF DECISION

In this case, tried to the Court without a jury, the defendants were charged

with mail fraud, 18 U.S.C. § 1341 [1], fraud committed through interstate communication by wire, 18 U.S.C. § 1343 [2], fraudulent possession and sale of altered coins, 18 U.S.C. § 331 [3], and conspiracy, 18 U.S.C. § 371 [4].

During the seven day trial, the Court heard the testimony of fifteen government witnesses and six defense witnesses. Numerous exhibits, photographs and slides, as well as movies of the coin minting process, were introduced. The defendants did not testify.

## THE INDICTMENT

Counts 1 through 27 of the indictment charge both defendants with knowingly devising a scheme to defraud coin collectors and dealers by inducing them to purchase certain 1964 one-cent coins which had been fraudulently altered to appear to be legitimate "mint errors". The defendants used the mails to insert advertisements in the New York Times, offering the altered coins for sale for more than $25 each.

Counts 28 through 34 charge both defendants with sending certain letters, teletypes and telegrams in order to promote and execute their fraudulent scheme. Count 35 alleges defendant Piacentile, also known as Pease, sold approximately ten of the altered coins to interested purchasers, and count 36 charges defendant Sheiner with a similar crime. Count 38 is the fraudulent possession count against Sheiner alone while count 39 alleges that both defendants conspired to commit the violations described in the other counts.

## ISSUES

The Court finds from the uncontroverted testimony and the stipulations entered into between counsel that the government proved beyond a reasonable doubt all the material allegations in each count of the indictment relating to the defendants' possession of the coins in question, their sale of the coins to interested collectors and dealers, and their use of the mails and interstate wires to advertise and promote the sale of the coins to the public.

The primary issues remaining are 1) were the coins fraudulently altered, and 2) if so, did either one or both of the defendants possess the requisite knowledge and fraudulent intent necessary to sustain a conviction under the statutes.

1. Whoever, having devised or intending to devise any scheme or artifice to defraud, * * *, or to sell, dispose of, * * * or procure for unlawful use any counterfeit or spurious coin, * * *, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. Whoever, having devised or intending to devise any scheme or artifice to defraud, * * *, transmits or causes to be transmitted by means of wire, * * * in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

3. Whoever fraudulently possesses, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or brings into the United States, any such coin, knowing the same to be defaced, mutilated, impaired, diminished, falsified, scaled, or lightened—Shall be fined not more than $2,000 or imprisoned not more than five years, or both.

4. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

### ADVERTISING AND SALE OF THE COINS

In April, 1965, Piacentile began selling certain 1964 multi-struck, one-cent coins to interested collectors and dealers. These coins had a multiple image of Lincoln's face on the obverse side of the coin. On most coins there appeared also a double impression of the date "1964" and the word "Liberty". The back of each coin contained a bulge in the metal, but there were no multiple images thereon. The selling price of these coins at this time was $400 for a roll of fifty pennies, with a "money back guarantee" if "they were proven to be otherwise" than as represented. Several of the early purchasers had the coins checked by other collectors and dealers to determine whether or not the coins were authentic Mint errors. At least one purchaser returned the coins to Piacentile, who refunded the purchase price without objection.

In early May, 1965, Piacentile approached Sheiner, the owner of a retail coin shop known as Bronx Coins, to determine whether Sheiner would help him dispose of the coins. After an inspection of the coins, Sheiner agreed. A few days later, Sheiner gave some coins to a local dealer who, after examining them, referred the matter to the Secret Service. The federal agency's interest in the coins provoked controversy among coin collectors as to their authenticity. In an attempt to settle the dispute, Sheiner conducted a coin show on May 23, 1965, in the Henry Hudson Hotel, advertising the event in the New York Times of May 18, 1965, in part as follows:

"FABULOUS

JUST DISCOVERED
1964–P Multiple Struck Cent

Authentic—Beautiful—Unusual—Terrific

We are opening a new bag containing them."

In the presence of over a hundred people and flanked by two Pinkerton guards, Sheiner placed a Federal Reserve bag on a table. He announced to the audience that the sealed bag had not been opened previously. A coin dealer in the audience informed Sheiner he could open the bag without tearing the seal. Sheiner offered the sealed bag to the dealer who started to remove the seal. But Sheiner grabbed the bag from the dealer and cut it open with a pair of shears. He thereafter examined each of the coins until he "found" three multi-struck coins. At this point a Secret Service agent in the audience questioned Piacentile concerning the source of the coins. Piacentile replied that he could not reveal that information.

During the following months Sheiner sold over 100 multi-struck coins at prices varying from $40 to $75 each. In September, 1965, a grand jury was convened to investigate whether Sheiner and Piacentile were violating federal laws. Sheiner chose to testify and answered all questions addressed to him.

Even after the grand jury proceedings, the defendants placed many advertisements in the New York Times, urging the public to buy coins from the "Piacentile Find". Typical advertisements read in part as follows:

"THE FABULOUS
 1964–P

MULTIPLE STRUCK
 CENT

Guaranteed 100% Mint Error
We found them in
Fed. Reserve Sealed Bags"
New York Times, February 20, 1966.
"1964–P
MULTIPLE STRUCK CENTS
 * * *
All coins brilliant uncirculated gems. All coins guaranteed to come from the original PIACENTILE FIND and are 100% mint errors"
New York Times, April 17, 1966.

In addition, Sheiner utilized his teletype service to advertise and sell these coins throughout the country.

The defendants were arrested on June 21, 1966. A search of Piacentile's apartment disclosed an additional 245 multi-struck coins in a suitcase.

## AUTHENTICITY OF THE COINS

At the trial each side offered expert testimony concerning the authenticity of the coins sold or possessed by the defendants. The Court credits the testimony of Morris Boley, Assistant Technical Consultant to the Director of the United States Mint, in its entirety on all material issues with respect to the validity of the coins. Mr. Boley's qualifications were unimpeachable, and the Court was impressed with his practical experience, technical knowledge, and general demeanor.

Mr. Boley concluded that the coins in question were genuine one-cent pieces which had been altered by impressing a second image upon them after they left the Mint. Therefore, they could not be legitimate Mint errors.

During a lengthy examination, Mr. Boley, with the aid of movies, slides, model dies and photographs, carefully and thoroughly supported his factual opinions. It would serve no useful purpose to review here all the details of his technical, scientific testimony. Reference to a few basic facts concerning the mechanics of manufacturing coins will demonstrate the logic of his conclusions.

The type of press which produced the 1964 Mint pennies was equipped with dual sets of dies: two obverse or head dies and two tail dies. Each stroke of the press produced two coins. The head dies were firmly held in place by three set screws. The lower dies were made of carbon steel with diameters of .739 of an inch. They moved up and down in steel collars with diameters of .748 of an inch. To stamp coins, a reciprocating feed mechanism would convey blanks into the press. The feed was equipped with metal fingers which would pick up two blanks at a time and deposit them in the coinage collars holding the lower dies. The fingers would then withdraw to pick up two more blanks for the next stroke.

While the blanks were in the collar the upper and lower dies would come together to impress the blanks into pennies under pressure of 45 tons per coin. After the strike the upper die would release and the lower die would raise the pennies flush in the collar. The fingers would come across, push the two new pennies into a receptacle, and then deposit the next two blanks into the collars for the next stroke of the press. The press stamped approximately 300 pennies per minute.

Therefore, there were only two possible ways the Mint could have produced 1964 pennies with a double image: either the coin itself or the instrument producing the impressions on the coin must have rotated after the first strike.

The coin rotation theory must be rejected. Obviously, if the coins did rotate in the collar after the first strike, the action of the lower dies on the second strike would impress the tail sides of the once struck coins with a second image. But the tail sides of the defendants' coins bear no displaced images. This alone negates the possibility that the coins turned in the collar after the first strike. In addition, the coin rotation theory necessarily requires that the pennies remain in or on the collar after the first strike. This means postulating an incredible set of unusual mechanical failures: the lower die must fail to raise the coins out of the collar or the feed fingers must fail to push the pennies off the collar after the first strike and, in either case, the feed fingers must also fail to place two new blanks on the collar to replace the normally ejected, struck coins. The Court is satisfied that the only way to multi-strike a penny by rotating it in the Mint would be to dismantle the press and hand-feed the blank through one cycle of the press.

The theory that the Mint's upper dies rotated or "rattled" to produce the coins in evidence also must be rejected. A rotation or rattle of the upper dies on descent, due to the highly improbable failure of the set screws to hold, would either smash the dies or mangle the coins. A further reason for ruling out the possibility of a loose die or die holder causing double-struck coins is based on the

"coin turn" principle. Boley explained that the head side of a Mint coin is lined up with its tail side so that if the head side is right side up, vis-a-vis the observer, and the coin is inverted on its horizontal axis, the tail side will also be right side up, vis-a-vis the observer. With respect to each of the coins in question, the "coin turn" test revealed that the heavy impression on the head side and the tail side bore the proper relationship to each other. No reasonable explanation was given, even by defendants' experts, as to how a loose die or die holder could cause various strikes on the face of a coin but always make the second strike or heavy impression in just the right place.

In addition, Boley testified that 210 of the 287 questioned coins in evidence had diameters in excess of .753 of an inch with some ranging as high as .759. In his experience he had never seen a Mint coin with a diameter in excess of .753 of an inch. Further, an examination of the defendants' coins disclosed that ten distinct types of altering tools were employed to impress them with a second image. None of these tools was similar to any die mechanism used at the Mint to produce 1964 pennies.

■ Under these circumstances, the Court finds that the defendants' coins were genuine pennies which had been altered after they left the Mint. These coins, therefore, were not Mint errors.

## KNOWLEDGE AND INTENT

The remaining issues for the Court are whether the government proved beyond a reasonable doubt the scheme to defraud and the requisite knowledge and intent necessary to support convictions under the charges alleged in the indictment.

■ The statutory crimes of mail fraud and fraud by wire, 18 U.S.C. §§ 1341, 1343, are broad in their scope and may ordinarily be shown by proof of the intentional devising of a scheme to defraud and the use of the mails or wire communications in furtherance of the scheme. United States v. Conte, 349 F. 2d 304, 306 (6 Cir. 1965), cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339; United States v. Houlihan, 332 F. 2d 8, 13 (2 Cir. 1964), cert. denied, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37; United States v. Baren, 305 F.2d 527, 528 (2 Cir. 1962). In interpreting these statutes, the courts have reached a great variety of stratagems aimed at obtaining money by fraudulent representations through the use of the mails or wire communications. See United States v. Conte, supra (corporate bonds); Babson v. United States, 330 F.2d 662 (9 Cir. 1964), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045 (jet training school); United States v. Baren, supra (knitting machines); Schaefer v. United States, 265 F.2d 750 (8 Cir. 1959), cert. denied, 361 U.S. 844, 80 S. Ct. 97, 4 L.Ed.2d 82 (razor blade vending machines); United States v. Kyle, 257 F.2d 559 (2 Cir. 1958), cert. denied, 358 U.S. 927, 79 S.Ct. 312, 3 L.Ed.2d 301 (gift toy club); Linden v. United States, 254 F.2d 560 (4 Cir. 1958) (annual business directory); United States v. Owen, 231 F.2d 831 (7 Cir. 1956), cert. denied, 352 U.S. 843, 77 S.Ct. 42, 1 L.Ed.2d 59 (nursery plants); Deaver v. United States, 81 U.S.App.D.C. 148, 155 F.2d 740 (1946), cert. denied, 329 U.S. 766, 67 S.Ct. 121, 91 L.Ed. 659 (burial lots); United States v. Dilliard, 101 F.2d 829 (2 Cir. 1938), cert. denied, 306 U.S. 635, 59 S.Ct. 484, 83 L.Ed. 1036 (mortgage pool).

■ Criminal intent and guilty knowledge, essential elements for conviction under the various charges in the instant indictment, need not be established by direct proof; they may be inferred from the statements and conduct of the defendants. Gusow v. United States, 347 F.2d 755, 756 (10 Cir. 1965), cert. denied, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159; Estep v. United States, 140 F.2d 40, 45 (10 Cir. 1943); Stone v. United States, 113 F.2d 70, 75 (6 Cir. 1940). If the defendants' acts were done inadvertently, mistakenly, or in good faith without an intention to de-

fraud, then the government has not sustained its burden of proof, and the defendants must be acquitted. United States v. Baren, supra, 305 F.2d at 533; Silverman v. United States, 213 F.2d 405, 407 (5 Cir. 1954), cert. denied, 348 U.S. 828, 75 S.Ct. 46, 99 L.Ed. 653; Deaver v. United States, supra, 155 F.2d at 744; Hawley v. United States, 133 F.2d 966, 972 (10 Cir. 1943). Some reasonable latitude is permissible when one extols the merits of one's product or engages in a certain degree of "puffing" or "salesmanship" to sell one's product. Babson v. United States, supra, 330 F. 2d at 664.

 On the other hand, if the defendants acted wilfully and purposely with an evil intent, or with a reckless indifference to the truth, then they are chargeable with the requisite knowledge and criminal intent. Irwin v. United States, 338 F.2d 770, 774 (9 Cir. 1964), cert. denied, 381 U.S. 911, 919, 85 S.Ct. 1530, 14 L.Ed.2d 433; United States v. Rabinowitz, 327 F.2d 62, 78 (6 Cir. 1964); Stone v. United States, supra, 113 F.2d at 75. In a leading case, Judge Learned Hand stated:

"* * * that although a man might not be charged for his honest beliefs, however imbecile they might be, it was not necessary to show that he disbelieved what he said. Some utterances are in such form as to imply knowledge at first hand, and the utterer may be liable, even though he believes them, if he has no knowledge on the subject. And all unconditional utterances, intended to be taken seriously, imply at least a belief, and, if the utterer does not believe them, they are false, though his mind be quite indeterminate as to their truth." Knickerbocker Merchandising Co. v. United States, 13 F.2d 544, 545 (2 Cir. 1926), cert. denied, 273 U.S. 729, 47 S.Ct. 239, 71 L.Ed. 862.

See also Holmes v. United States, 134 F.2d 125, 133 (8 Cir. 1943), cert. denied, 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722; United States v. Rowe, 56 F.2d 747, 749 (2 Cir. 1932), cert. denied, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289. Moreover, the deception need not result from the verbalized representations alone. The arrangement of the words in an advertisement in order to attract a particular segment of the public may itself convey a false appearance. Linden v. United States, supra, 254 F.2d at 568.

Applying these general principles to the credible evidence in the instant case, it is clear that the government has sustained its burden of proof on the issues of knowledge and intent on each count of the indictment.

The coins in question were altered after leaving the Mint. By false advertising, the defendants induced interested coin collectors and dealers to purchase these coins in the expectation they would receive "100% mint errors". The appeal to the coin collector's world was glittering and attractive in form, yet false and deceptive in fact.

 There is ample evidence in the record that the defendants acted with criminal intent and guilty knowledge. The tainted origin of hundreds of these altered coins focuses attention on the defendants. These coins were altered by a series of different tools at a considerable investment of time and money. The defendants' explanation to collectors that all of these coins found their way into one or two Federal Reserve bags, fortuitously discovered by Piacentile, is incredible. In order to exploit the average collector's anxiety to add a "rarity" to his collection, the defendants conceived a scheme to clothe their coins with authenticity and to deceive interested persons who otherwise would have been more wary. The "show" at the Henry Hudson Hotel was an elaborate hoax in this direction. Moreover, in June, 1965, the defendants were aware that officials at the Mint had appraised the coins and concluded they had been "altered by private persons subsequent to issuance by the mint." The defendants' public re-

buttal that the Mint "never admits errors" was a misrepresentation intended to beguile amateur collectors. Despite grand jury investigations of their activities, the defendants persisted in deceptive advertising to entice coin collectors of ordinary prudence and comprehension to make purchases which they otherwise would not have made. See United States v. Press, 336 F.2d 1003, 1011 (2 Cir. 1964), cert. denied, 379 U.S. 965, 85 S. Ct. 658, 13 L.Ed.2d 559, Fry v. United States, 379 U.S. 973, 85 S.Ct. 670, 13 L. Ed.2d 563. In addition, the defendants intentionally published a series of falsehoods to aid their scheme to convince the coin world that the "Piacentile Find" was authentic. Two examples illustrate the deception. In a letter to *Coin World,* a leading and respected newspaper for numismatists with a weekly circulation of 108,000, Sheiner wrote for publication that at the Henry Hudson Hotel "opening", he "offered the bag with the seal intact to the secret service agents to bring back to the mint to do whatever was necessary to determine the authenticity of the sealed bag", but the agents refused his offer. To *Numismatic News,* another well-known periodical, Sheiner wrote that the discovery of the coins had been "authenticated" by Federal Reserve people. These statements were materially false. Enthusiasm cannot justify, nor optimism excuse these deliberately false representations. Further, defendants' attempts to convince collectors and dealers that "other persons" had also "discovered" similar multi-struck coins and the defendants' "money back" guarantee advertising were calculated devices to deceive. See Irwin v. United States, supra, 338 F.2d at 775–76; United States v. Press, supra, 336 F.2d at 1007; United States v. Sylvanus, 192 F.2d 96, 105 (7 Cir. 1951), cert. denied, 342 U.S. 943, 72 S.Ct. 555, 96 L.Ed. 701.

Accordingly, the Court finds that the government has sustained its burden of proof beyond a reasonable doubt as to each essential element of each crime alleged in the indictment. The defendants are guilty as charged.