**UNITED STATES of America,
Appellee,**

v.

**William SHEINER and Victor Piacentile,
a/k/a Victor Pease, Appellants.**

**Nos. 413, 414, Dockets 32444, 32547.**

United States Court of Appeals
Second Circuit.

Argued March 14, 1969.

Decided April 4, 1969.

Stephen J. Hochhauser, New York City (Blinder & Steinhaus, New York City, on the brief), for appellant Sheiner.

Herbert S. Siegal, New York City, on the brief, for appellant Piacentile.

Frank M. Tuerkheimer, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, Jack Kaplan, Asst. U. S. Atty., on the brief), for appellee.

Before MOORE and FEINBERG, Circuit Judges, and McLEAN, District Judge.*

FEINBERG, Circuit Judge:

This appeal is from a judgment of conviction in the United States District Court for the Southern District of New York, after a seven day non-jury trial be-

fore Robert C. Zampano, United States District Judge for the District of Connecticut, sitting by designation. In a detailed opinion, 273 F.Supp. 977, Judge Zampano found both appellants guilty on 34 counts charging fraudulent use of the mail or interstate wires, 18 U.S.C. §§ 1341, 1343, and of one conspiracy count, 18 U.S.C. § 371; in addition, appellant Sheiner was found guilty of the sale and possession, and appellant Piacentile of the sale, of fraudulently altered pennies in violation of 18 U.S.C. § 331. Appellants were each sentenced to three months imprisonment on one count of the mail fraud charges, to be followed by two years probation on all the other counts. On May 21, 1968, Judge Zampano denied appellant Sheiner's motion to set aside his conviction. In this appeal Piacentile primarily questions the sufficiency of the evidence that the coins in question were fraudulently altered or that he knew that they were. Appellant Sheiner argues only that his representation by the same trial attorney as Piacentile was so prejudicial as to deny him the effective assistance of counsel.[1] A review of the relevant facts indicates that these claims are without merit.

I

In April 1965, Piacentile began advertising and selling "multi-struck" 1964 pennies to coin collectors and dealers. He alleged that he had discovered the coins in several sealed Federal Reserve bags of pennies which he had purchased for purposes of speculation apparently because of a coin shortage. The coins were impressed with multiple images of Lincoln on their heads; some of them also had a double impression of the date and the word "Liberty." The metal on the "tail" sides of the coins bulged but carried no multiple images. In May 1965, Piacentile approached Sheiner, the

---

* Of the Southern District of New York, sitting by designation.

1. Sheiner's brief also points out in its conclusory paragraph that:
   "if this Court concludes from co-defendant Piacentile's arguments that the government's evidence was inadequate or that other prejudicial error occurred at the trial, then such conclusions would be equally applicable to defendant Sheiner."

owner of a retail coin store, who agreed to help him distribute the coins.

Apparently in reaction to controversy in the coin world about the authenticity of the pennies as mint errors, appellants advertised and held a demonstration on May 23, 1965, at a coin convention in a New York hotel. Before an audience of about 100 people, Sheiner displayed a sealed Federal Reserve bag which he announced had not been opened previously. A coin dealer present pointed out that such bags could be opened without breaking the seal and started to demonstrate, but Sheiner snatched the bag back from him before he could finish. Sheiner then cut open the bag, examined the coins in it, and found three of the multi-struck pennies among them. At trial, one of the Government's witnesses demonstrated that a Federal Reserve bag could be opened and closed without breaking the seal. As the Government noted at trial, it is difficult to imagine how appellants could have known in advance—or even hopefully expected—that some of their multi-struck pennies would actually be in a particular Federal Reserve bag, unless they had previously opened it themselves or knew that it had been opened. Yet their advertisements of the show announced with great confidence: "We are opening a new bag containing them [multiple struck pennies]."

In the following weeks Sheiner and Piacentile wrote to a number of coin journals reporting the events of the convention demonstration in several versions. In one such report Federal Reserve personnel at the show were alleged to have authenticated the event; in others it was claimed that Secret Service agents had been offered the bag at the convention, either to determine its authenticity or for confiscation, but had refused to take it. According to the uncontradicted testimony of the Government's witnesses, none of these allegations was true. In the three months following the coin show Sheiner sold over 100 of the coins at prices ranging from $40 to $75 each. Appellants continued to advertise the pennies extensively in the

New York Times and on Sheiner's teletype wire to other dealers until their indictment in June 1966.

## II

The record below amply supports the trial judge's finding that the pennies were not true mint errors but had been artificially altered to appear multi-struck after they left the mint. The chief government witness, an Assistant Technical Consultant to the Director of the Mint, demonstrated in detail that it would have been physically impossible for the federal mint machinery to have produced the type of multiple impressions found on the Piacentile pennies. In addition, he testified that the coins were too large in diameter to have come from the mint but might have been enlarged by being restruck on some other press, and that the bulge on the tail side of the coins would be a natural result of striking the head after the coin had been removed from its original die, but could not have been caused by multi-striking in the original. Although the defendants, neither of whom took the stand, produced four expert witnesses who testified that they thought the coins were genuine mint errors, none offered a satisfactory explanation of how the mint equipment could have produced the multiple strikes.

Piacentile argues that the conclusion that the coins were artificially altered was merely an "inference" and was impermissibly based on the opinions of the Government's witnesses, rather than on established facts. A persuasive showing that the multi-striking could not have been caused by the mint machinery, however, is substantial proof that they were tampered with after leaving the mint. The Government's expert witness presented a description of the technical operation of the mint as a factual basis from which to determine the source of the multi-striking. His opinions, based on that factual presentation, were clearly admissible.

[W]hen the subject matter is of such a technical nature that the proper conclusion to be drawn from the facts de-

pends upon professional or scientific knowledge or skill, qualified experts may express their opinions as to the proper inference to be drawn from a given set of facts, as an aid to the jury in reaching their own conclusion in the case before them.

Richardson, Evidence § 387, at 378–79 (9th ed. 1964); see 2 Wigmore, Evidence § 557 (3d ed. 1940).

■ Piacentile also asserts that the trial judge completely disregarded the opposing testimony of the defense witnesses and the cross-examination of the Government's witnesses. There is no indication that the judge failed to evaluate this evidence. Indeed, he specifically took defense testimony into account when he held that "[n]o reasonable explanation was given, even by defendants' experts," of how the coins could be mint errors. 273 F.Supp. at 982. His conclusion must be sustained "if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). On the record before us that standard is satisfied.

■ Piacentile next argues that no proof was evinced that defendants knew or should have known that the coins were altered after leaving the mint, that finding being merely an "inference built upon another inference," which could establish no more than a suspicion of guilt. As we noted above, the finding that the coins were illegally altered outside the mint was virtually a corollary of the finding that they were not multi-struck by the mint. While knowledge is a necessary element of the crime of passing or possessing a defaced coin, 18 U.S.C. § 331, a finding of knowledge that is largely inferential is not impermissible.

Knowledge in the mind of another is a subjective thing. It is not always capable of proof by positive or direct evidence. It may be inferred or gathered from the outward manifestations, by the words or acts of the party charged with knowledge and from the facts and circumstances surrounding or attendant upon the act with which it is charged to be connected. It may be proved by all the facts and circumstances disclosed by the evidence taken in connection with the case.

Anderson v. United States, 270 F.2d 124, 127 (6th Cir. 1959); see United States v. Carlson, 359 F.2d 592, 597 (3d Cir.), cert. denied, 385 U.S. 879, 87 S.Ct. 161, 17 L.Ed.2d 106 (1966). Thus, in cases of criminally passing counterfeit United States obligations, guilty knowledge has been held properly inferable from a variety of circumstances, including the incredibility of the defendant's explanation of how she obtained the counterfeits, see McMillon v. United States, 272 F.2d 170 (5th Cir. 1959), cert. denied, 362 U.S. 940, 80 S.Ct. 805, 4 L.Ed.2d 769 (1960); cf. United States v. Petrone, 185 F.2d 334 (2d Cir. 1950), cert. denied, 340 U.S. 931, 71 S.Ct. 493, 95 L.Ed. 672 (1951), the existence of circumstances which should have made him suspicious of their genuineness, see Paz v. United States, 387 F.2d 428, 430 (5th Cir. 1967) (dictum; guilty knowledge held not proved); cf. Hagan v. United States, 295 F. 656 (6th Cir. 1924), or the number of counterfeits passed over a short period of time, see Ruiz v. United States, 374 F.2d 619, 620 (5th Cir. 1967); cf. United States v. Releford, 352 F.2d 36, 39 (6th Cir. 1965), cert. denied, 382 U.S. 984, 86 S.Ct. 562, 15 L.Ed.2d 473 (1966).

■ At the time of his arrest, Piacentile was still in possession of 245 of the multi-struck pennies; in the preceding months at least 110 had been sold. His explanation to buyers was that he had purchased a large quantity of 1964 pennies in their sealed Federal Reserve bags, apparently as a speculation because of a coin shortage. When this turned out to be unrewarding, he decided to "return them to the banks." Before doing so, he asked his children to examine the bags to see if there were any errors in the coins, and they found multi-struck coins. The trial judge described this story as "incredible," and no more plausible explanation was offered by the de-

fense at trial. Even if appellants had initially believed in the authenticity of the coins, however obtained, subsequent events could not have failed to raise serious doubts in their minds. Not only was the validity of the coins as mint errors hotly debated in coin collecting circles, but in June 1965, after the technical staff of the mint had examined some of the pennies, the Director of the Mint announced that they were not true mint errors but had been altered by private individuals. Nevertheless, appellants continued to market the coins as mint errors, advertising them extensively up until their indictment in June 1966. In addition, their repeated and deliberate falsifications in promoting and advertising the coins—the spurious demonstration of the coins' authenticity at the coin convention and the patently false reports about the events of that show which they circulated to coin publications—were hardly consistent with a sincere belief in the coins' genuineness. The cumulation of this evidence was sufficient to support a finding that appellants had reason to know that the pennies were fraudulently altered.

The circumstances described above were equally sufficient to support appellants' conviction on the charge of using the mails and wires to defraud. In the light of this evidence, their false publicity reports and persistent advertisements of the coins as "100% mint errors" demonstrated at the very least a reckless indifference to the truth. See Gusow v. United States, 347 F.2d 755, 756 (10th Cir.), cert. denied, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965); Irwin v. United States, 338 F.2d 770, 774 (9th Cir. 1964), cert. denied, 381 U.S. 911, 85 S.Ct. 1530, 14 L.Ed.2d 433 (1965). In sum, we hold that the district court's findings as to the authenticity of the coins and the defendants' guilty intent were supported by substantial evidence.

### III

Appellant Sheiner argues that his representation at trial by the same attorney as Piacentile denied him the effective assistance of counsel. After a thorough hearing, the district court denied Sheiner's motion to set aside the conviction on this ground, finding that there was no showing of conflicting interests between the two defendants or of prejudice from the joint representation, and that in any event Sheiner had expressly agreed to the joint defense.

During the second day of the trial, Judge Zampano asked about the relationship between the two defendants. When the Government replied that the evidence would show that Sheiner was the "outlet" for coins provided by Piacentile, the court stated:

> Well, in view of the Government's claim at this point, which may come as a surprise to the defendants, I would like to alert Mr. Sheiner to the fact that if he in any ways feels there is now a conflict of interest between the two defendants, I will certainly entertain his request for separate counsel.
>
> I know you are represented by eminent counsel, Mr. Sheiner, one of experience and one of renown, in this city. On the other hand, we now have testimony that the Government is going to claim that you received these coins from Mr. Piacentile. There may be a conflict, and if at any time you feel that you may be in position of having competing interests with Mr. Piacentile, please let me know and I will certainly give you time to talk it over with counsel and perhaps get another attorney.
>
> On the other hand, my mind is wide open. I have not made any conclusions or decisions.
>
> The Government is now claiming that you obtained the coins from someone else. In view of that there might be a difference in your status, you see.

Thereupon, Mr. Siegal, defendants' attorney conferred with Sheiner, explaining that there might be a conflict of interest on the grounds that Sheiner's knowledge about the coins was based on Piacentile's representations but stating that he did not think separate counsel

was necessary. Sheiner also conferred privately with Mr. Walters, an attorney and president of the Retail Coin Dealers Association, who assisted the defense. The following day, the court again addressed appellant:

Mr. Sheiner, you recall yesterday I made some comment about the possibility that there may be a conflict of interest between your position and Mr. Piacentile's, and I indicated if you thought there might be I would give you an opportunity to obtain an attorney, and, in any event, think about it and talk it over with your counsel. Now I understand that you have thought about it, you have considered it, weighed all the aspects of this case, and decided to proceed with Mr. Siegal? Is that correct?

Sheiner replied, "That is correct."

At the hearing on a motion to set aside the conviction, Sheiner testified that he had been advised even before the commencement of the trial to retain his own attorney by a friend and lawyer, Mr. Rubenstein, and that Sheiner had brought up the question with Mr. Siegal, who contacted Mr. Rubenstein and discussed it with him.

It is apparent from the foregoing that Sheiner was alerted to the possible desirability of retaining separate counsel and that substantial consideration had been given to the matter. Although he testified at the hearing that he had not understood what "conflict of interest" meant, we find that the nature of the potential disability of joint representation had been adequately described to him. Both sides stipulated on the motion for a new trial that Mr. Rubenstein would have testified that he told Sheiner that "there might be defenses available to him * * * that were not available to the co-defendant Piacentile, since Sheiner was just selling the coins as agent for Piacentile." Similarly, Mr. Siegal testified that he explained the situation to the defendant in substantially the following words:

The only possibility of a conflict of interest is a situation that you were the one who did not obtain the coins originally, that you obtained the coins from Piacentile, so possibly there might be a difference of position, because they would have to prove that you had knowledge, any knowledge that they would have to prove would have to come through Piacentile, and you can't go further back than Piacentile because you have no knowledge as to how he obtained the coins, all that you know is what he told you.

▆▆▆ In Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Supreme Court stressed the importance of representation free from conflicting interests as part of the basic sixth amendment right to the assistance of counsel in criminal defenses, and cautioned that waiver of this right was not lightly to be found. In an assigned counsel context, this court has recently stressed that serious problems are avoided by having representation by separate counsel in criminal cases involving more than one defendant, see Morgan v. United States, 396 F.2d 110, 114 (2d Cir. 1968); the potential hazards of joint representation are as likely to be present when counsel is retained as when assigned. However, defendants who retain counsel also have a right of constitutional dimensions to representation by counsel of their own choice, see United States ex rel. Davis v. McMann, 386 F.2d 611 (2d Cir. 1967), cert. denied, 390 U.S. 958, 88 S.Ct. 1049, 19 L.Ed.2d 1153 (1968); that choice should not unnecessarily be obstructed by the court. We think that the evidence in this case shows that Sheiner was clearly informed of the possibility of prejudice from sharing Piacentile's counsel but that he freely made a considered choice to continue Mr. Siegal's joint representation. The court was scrupulous in alerting Sheiner and his counsel to the danger of conflicting interests and in specifically ascertaining that Sheiner had discussed the question with counsel, considered it and decided to proceed with Siegal. See United States v. Armone, 363 F.2d 385, 405–406 (2d Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 391, 17

L.Ed.2d 303 (1966); cf. Olshen v. Mc-Mann, 378 F.2d 993, 994–995 (2d Cir.), cert. denied, 389 U.S. 874, 88 S.Ct. 165, 19 L.Ed.2d 157 (1967); Campbell v. United States, 122 U.S.App.D.C. 143, 352 F.2d 359 (1965).

Moreover, we find the actual conflict of Sheiner's and Piacentile's interests and the possible prejudice which the former might have suffered to be so minimal as to warrant affirmance even in the absence of his explicit acquiescence in joint representation. See United States v. Goldberg, 401 F.2d 644, 648 (2d Cir. 1968); United States v. Paz-Sierra, 367 F.2d 930, 932–933 (2d Cir. 1966), cert. denied, 386 U.S. 935, 87 S.Ct. 962, 17 L.Ed.2d 807 (1967); United States v. Bentvena, 319 F.2d 916, 937 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). Sheiner's main contention on this appeal is that separate counsel could have emphasized that he lacked any guilty knowledge, having acted wholly in reliance on Piacentile's story about the coins' origin. However, portions of Sheiner's testimony before the grand jury, introduced at trial, did clearly convey this version—that he had received the pennies from Piacentile, was convinced of their authenticity, and unquestioningly accepted Piacentile's explanation that they had been found in Federal Reserve bags. Moreover, the trial court was well aware of this contention and considered it before finding Sheiner guilty. Sheiner apparently argues that separate counsel could have strengthened this defense by demonstrating the falsity of Piacentile's story of how he found the coins. Proving that would not seem to be helpful to Sheiner, but in any event whether the story was true in fact is irrelevant to whether Sheiner believed it. Sheiner also complains that certain documents purporting to be guarantees of the pennies' authenticity by Piacentile should have been placed in evidence. The documents were prepared one month after Sheiner's indictment, and were backdated. Putting to one side their dubious value under those circumstances, not only

did Sheiner never bring them to Mr. Siegal's attention before the conclusion of the trial, but their use would not have been inconsistent with the interests of Piacentile's defense. Finally, Sheiner contends that his own counsel might have sought to use a variety of trial strategies more advantageous to him such as a jury trial or a motion to sever. However, the possibility that Sheiner's present appellate counsel might have employed different or arguably better trial techniques does not rise on these facts to the level of prejudice sufficient to require a new trial.

Judgment affirmed.