**UNITED STATES of America,**

v.

**Vanessa MELTON, Defendant.**

**No. 84 Cr. 322 (RWS).**

United States District Court, S.D. New York.

Feb. 7, 1985.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for the U.S.; Jess T. Fardella, Asst. U.S. Atty., New York City, of counsel.

Caesar D. Cirigliano, The Legal Aid Soc., New York City, for defendant; John P. Curley, New York City, of counsel.

## OPINION

SWEET, District Judge.

Defendant Vanessa Melton ("Melton") has moved post-trial for an acquittal or new trial pursuant to Fed.R.Crim.P. 29 and 33. For the reasons stated below, the motion is denied.

### Prior Proceedings

Melton was charged in Counts One and Four of a four-count indictment with conspiracy to distribute heroin in violation of 21 U.S.C. § 846 and distribution of heroin and possession of heroin with intent to distribute on March 26, 1984 in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2. Calvin McLean ("McLean") was charged in all four counts of the indictment and Jerry Braddy ("Braddy") and Nathan Graham ("Graham") were also charged as conspirators under Count One and as aiders and abettors of McLean in the actual distributions of heroin which formed the basis of Counts Two and Three, respectively. On August 2, 1984, after a four-day trial at which she did not testify, Melton was convicted on Count Four of the indictment charging possession of heroin with intent to distribute and distribution of heroin. The jury was unable to reach a verdict on the conspiracy count as to Melton.

### Statement of the Government's Evidence

Early in 1984 Detective Marcellus Ward ("Detective Ward") of the Baltimore City Drug Enforcement Task Force was working in an undercover capacity with the New York Drug Enforcement Task Force under the name "Mike" or "Skinny Pimp." Detective Ward had been introduced to McLean by a confidential informant known as "Concrete" at 2531 Eighth Avenue, New York, New York. Detective Ward and Concrete had given McLean $3,500 in cash, in return for which McLean promised to provide them with an ounce of heroin with the understanding that he would eventually receive an additional $4,000. Concrete subsequently on January 19 lost the money when the transaction could not be completed. Thereafter, McLean offered Detective Ward a chance to earn back lost money by

fronting him a "spoon" (*i.e.*, a tablespoon full) of heroin, along with some dilutants (approximately 89 grams of mannitol and quinine).

On February 6, 1984, Detective Ward, wearing a Nagra body recorder, met with McLean in the vicinity of 2531 Eighth Avenue, where he gave McLean $1,000 for the heroin previously "fronted" him on January 19, and $3,000 for another purchase of heroin. In return, McLean provided him with 8.9 grams of 40.5 percent pure heroin. On March 14, 1984, Detective Ward, after making contact with McLean through Graham and Braddy, gave McLean an additional $2,000 for more heroin and on March 26, 1984, McLean called Detective Ward at his undercover telephone in Baltimore and told him to come to New York to pick up his package.

At approximately 9:00 p.m., Detective Ward, again wearing a Nagra body recorder, arrived in the vicinity of 2531 Eighth Avenue and met Braddy. At approximately 10:15 p.m., McLean arrived in a gypsy cab and advised Detective Ward that his girlfriend "Vanessa" would arrive shortly with the package containing five and one half "spoons" of heroin at the Blue Note Bar on the corner. During the next hour, McLean and Detective Ward waited in the latter's car. Finally McLean had Braddy take Detective Ward's car to pick up Melton. As Braddy departed, McLean and Detective Ward went across the street into the Blue Note Bar, which was noisy and crowded.

A short time later, Melton arrived, and McLean told her he had been concerned that she had been stopped or had gotten in trouble with the package. Detective Ward had seen Melton on two prior occasions, both in the vicinity of 2531 Eighth Avenue, once when she was with McLean and once when she was looking for McLean. Confirming that she had the package, Melton pulled out a tinfoil packet which was later established to have contained 15 grams of 34.5 percent pure heroin from her pocketbook and showed it to McLean. With Melton watching, McLean opened the packet,

displayed its contents, and announced "that's white, that's good stuff." He then refolded it, and directed Detective Ward to the storefront on the first floor of 2531 Eighth Avenue to wait for Braddy's return. Melton also went into the storefront.

McLean took the tinfoil packet back from Detective Ward and gave it to Graham, and then retrieved it from Graham and placed it atop a refrigerator under a newspaper. Melton, McLean and Detective Ward went to the back of the storefront where McLean asked Melton if she had the other package. She replied in the affirmative and retrieved another tinfoil packet from her pocketbook similar to the one she had previously given McLean for Detective Ward. McLean opened the packet and with a $10 bill scooped out some of the white powder, refolded it, and placed it atop the refrigerator where he had previously placed Detective Ward's packet. Then McLean asked Melton for "pot," and she gave him a plastic bag containing a green leafy brown substance. McLean then removed the tobacco from a cigarette and replaced it with some of the marijuana from the plastic bag and some of the heroin from the $10 bill. He then twisted the top of the cigarette, lighted it, and passed it around to various people, including Melton, who puffed on it. Graham took a snort of the white powder from the $10 bill. McLean's daughter, in Melton and McLean's presence, expressed her disappointment to Detective Ward that he had come to New York because she had expected to make some money by taking the package to him in Baltimore. No statements were attributed to Melton.

Subsequently, an individual unknown to Detective Ward drove up to the store-front in a red Porsche. McLean engaged in conversation and McLean gave the newcomer the second tinfoil packet. Braddy returned with Detective Ward's car, Detective Ward then returned to the DEA office with the first tinfoil packet of heroin Melton had brought that night.

On April 24, 1984, McLean, accompanied by another girlfriend of his called "Peach-

es," met Detective Ward at a Baltimore area restaurant. In the presence of Peaches and over dinner, McLean and Detective Ward negotiated for the purchase of additional heroin. After the meal, Detective Ward gave McLean a brown paper bag with cut newspaper, intended to look like a bag of cash, and McLean was arrested as he pulled out of the parking lot.

Later that same evening, Task Force Officers and agents went to the apartment complex at 309 North Broadway in Yonkers to execute an arrest warrant for Braddy. Their knock on the door of Apartment 2C was answered by Melton. She stated that Braddy was her boyfriend, that he lived there only occasionally and that she herself lived there. The officers and agents then left the apartment and then went to a pay phone about two blocks away, where they placed a call to an Assistant United States Attorney and received authorization to arrest Melton. As they were returning to 309 North Broadway approximately ten minutes later, they saw Melton enter a taxi which went to the railroad station. There they found Melton waiting on the platform for a northbound train, whereupon they placed her under arrest and advised her of her Constitutional rights.

At the DEA offices, Melton was informed that she was being charged with conspiracy and was readvised of her Constitutional rights by Agent Stanley Morrissey. She then asked Agent Morrissey, "How can I be charged with a sale if I didn't receive any money." Agent Morrissey then recounted the events of the evening of March 26, 1984 in the Blue Note Bar regarding Melton's providing the packet to McLean for Detective Ward, whom Agent Morrissey explained was actually an undercover agent named "Marty." Melton replied "Oh, Marty, or whatever his name is, he's one cute dude." Melton also gave her home telephone number as (914) 969–8020, the same number written on a playing card found in Graham's possession when he was arrested. She also later acknowledged that Apartment 2C at 309 North Broadway was "Calvin's apartment."

**The Issue**

Melton maintains that the evidence recounted is insufficient to permit the jury to reach its verdict of guilty on the substantive count of possession with intent to distribute. Both the Government and Melton agree that the issue is whether the facts stated above permit the inference that Melton knew what was in the packet and assisted in its distribution.

**Conclusions**

 At the outset, the jury's inability to reach a verdict with respect to Melton's participation in the conspiracy must be put aside. Even if the jury had acquitted on the conspiracy count, and even if the difference between conspiring and aiding and abetting is difficult, if not impossible, to perceive, such an inconsistent verdict would be upheld under the authorities. *United States v. Powell*, —— U.S. ——, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932).

 The framework for the court's consideration of the issues presented is familiar. A defendant advancing a claim based on insufficiency of the evidence carries "a very heavy burden." *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 4108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983); *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In addition, "pieces of evidence must be viewed not in isolation but in conjunction." *United States v. Carson, supra*, 702 F.2d at 362 (citation omitted); *see also United States v. Cicale*, 691 F.2d 95, 103 (2d Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983); *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25

L.Ed.2d 539 (1970). The reviewing court must draw all available inferences, and resolve all issues of credibility, in favor of the jury's verdict. *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983). Moreover, because intent and knowledge are subjective facts, *see United States v. Sheiner,* 410 F.2d 337, 340 (2d Cir.), *cert. denied,* 396 U.S. 825, 859, 90 S.Ct. 68, 127, 24 L.Ed.2d 76, 110 (1969), the requisite criminal intent may be established through circumstantial evidence. *United States v. Sanzo,* 673 F.2d 64, 69 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982).

■ Melton put two tinfoil packets in her purse, turned the one later proven to contain heroin over to McLean in a crowded bar, heard him declare, "that's white, that's good stuff," witnessed the transfer to Detective Ward, went across the street, turned over the second packet which was opened, a portion of white powder was extracted, used by Graham, mixed in a cigarette with marijuana and smoked. No statement is attributed to Melton concerning these events. Upon learning that Braddy was being sought, she left the apartment in Yonkers and was waiting for a northbound train when arrested. At a later time she stated: "How can I be charged with a sale if I didn't receive any money?"

Even if Melton's role as McLean's girlfriend is excluded from consideration as bearing only on the conspiracy charge, still the transfer of a tinfoil packets in a crowded bar, her participation in the events across the street, and her statement after arrest are enough to permit the jury to infer that she knew the contents of the packet. The casual treatment of the first packet, left on the refrigerator under a newspaper, is susceptible to an inference that the transfer and handling of such packets was commonplace and accepted and does not necessarily rebut her inference of knowledge. This is not the ample evidence as characterized by the Government, but it is enough, unless, of course, upon reflection certain of the evidentiary rulings at trial were erroneous and sufficient to require retrial.

The post-arrest statements just referred to were, of course, prejudicial, and in my view, at the time and now, properly before the jury for their evaluation. Melton's post-arrest statement that the Yonkers apartment was McLean's and that she was going to return to her mother's was relevant. Her knowledge of the ownership of the apartment, her presence there at the time of arrest and McLean's statement on the night of the transfer as to the origin of her trip to the bar, all facts from which it could be inferred that the packet came from McLean's apartment under circumstances under which Melton's knowledge of its contents and the nature of McLean's transaction could also be inferred. Knowledge of ownership of the apartment in which she was found, while certainly not determinative, was at least relevant.

■ Although counsel was not present at the time of making the statement, it was clearly voluntary, *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), and no objection was lodged on the grounds of counsel's absence.

Of course, the evidence of Melton's post-transfer act was prejudicial to Melton on the very issue of her knowledge. The instruction relative to the use and possession of marijuana must be credited as effective. *See United States v. Reed,* 639 F.2d 896, 907 (2d Cir.1981); *United States v. DiGeronimo,* 598 F.2d 746, 754 (2d Cir.), *cert. denied,* 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979). The issue remains close, however, but the view held at trial has not been changed by the post-trial submission.

The statements attributable to Melton's daughter were sufficient to place her within the ambit of the conspiracy charged. At best the statement was relevant only to the conspiracy charge and were not relevant to the substantive count involving the earlier transfer. No request for a limiting instruction was made, nor was the statement objected to except on the grounds of relevance.

**The Government's Summation**

The Government's summation was appropriate in light of the issues raised by the defense. *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981).

The motions are denied.

IT IS SO ORDERED.