**Nels IRWIN and John F. Kerns,**
**Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 19103.**

United States Court of Appeals
Ninth Circuit.

Oct. 21, 1964.

Rehearing Denied Dec. 29, 1964.

772

William J. D. Lane, Hallam Mathews, Allan M. Carson, Los Angeles, Cal., for appellant Nels Irwin.

Gibson, Hillsinger & Saunders, Lawndale, Cal., Bonaparte & Binder, Hollywood, Cal., for appellant John F. Kerns.

Francis C. Whelan, U. S. Atty., Richard A. Murphy, Asst. U. S. Atty., Chief, Criminal Section, Robert H. Filsinger, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before HAMLEY, JERTBERG and BROWNING, Circuit Judges.

HAMLEY, Circuit Judge.

Nels Irwin and John F. Kerns [1] were jointly tried before a jury, convicted and sentenced on sixteen counts of an indictment charging mail frauds in violation of 18 U.S.C. § 1341 (1958).[2] Each has appealed and the two appeals have been consolidated.

Each count upon which Irwin and Kerns were convicted relates to the mailing of a particular letter to a named individual or company on a specified date, ranging from May 22, 1958 to March 8, 1961. According to the indictment each letter was mailed for the purpose of executing a scheme and artifice to obtain money by defrauding prospective purchasers of work-at-home mail order businesses. As charged in the indictment, the fraud was accomplished by omitting material facts and by making certain material representations which were false and known to be false, upon which representations the prospective purchasers were expected to rely.

The evidence showed that Mail Order Distributors (M.O.D.) was a partnership consisting of Irwin and Citizens National Trust and Savings Bank of Los Angeles as trustee for Irwin's two children. Kerns was general manager of M.O.D. which maintained offices in Los Angeles. The company was in operation from May, 1958, to January, 1961, and by March, 1961, had completely wound up its affairs.

The business of M.O.D. consisted in selling "franchises" and other material to individuals and companies which desired to engage in the business of soliciting, by mail, orders for import items, such orders to be filled by overseas suppliers. In furtherance of this business, M.O.D. placed advertisements in magazines. When inquiries were received in response to these advertisements, solicitation materials were mailed directly to the residences of prospective purchasers. Included in these materials was an application for an "exclusive franchise," generally for the price of $29.95.

After paying this sum, the participant received the franchise and additional materials. Included in these was a manual of instructions and a notice that other materials, including catalogs and mailing lists, would be required, for which there would be a minimum charge of ninety dollars. The mailing lists were obtained by M.O.D. from the William Strole Company, and the catalogs were prepared by M.O.D. based on contacts with foreign suppliers. Upon paying for and receiving these additional materials, the franchise holder would mail out the catalogs to the names contained on the M.O.D. lists. After receiving orders for import items, the franchise holder would send it to the overseas suppliers to be filled. The overseas suppliers were to send the items directly to the purchasers.

M.O.D. averaged about three thousand franchise holders a year during the years

---

1. A third defendant, Clarence Nowak, was named in the indictment, but the indictment was dismissed as to him.

2. On each of nine counts of which he was convicted (Nos. 1, 2, 3, 4, 5, 6, 7, 9 and 11), Irwin was sentenced to imprisonment for three years, to run concurrently. On each of the remaining seven counts of which he was convicted (Nos. 14, 15, 16, 17, 18, 19 and 21), sentence was suspended and he was placed on probation for four years, commencing at the termination of imprisonment. Kerns received concurrent nine-month sentences on each of the nine counts on which Irwin received three-year sentences. Kerns received a suspended sentence and probation, similar to that granted Irwin, on each of the remaining seven counts.

it was in operation. The Government produced testimony showing that many franchise holders were able to sell only a few import items under this plan and that their receipts therefrom were far less than their expenses. The small number of orders received was reduced even further since, in many cases, the franchise holders had to ·make refunds to purchasers because of non-delivery of goods by the foreign suppliers.

Complaints received by M.O.D. from franchise holders sometimes averaged fifteen per day. Franchise holders who sought refunds after the first expenditure of $29.95 were usually told that there could be no refund until the franchise holder had made at least one purchase of the additional materials. Some purchasers were unable to obtain materials for which they had paid until after several prompting letters. Some franchise holders repeatedly asked M.O.D. for advice and assistance but received no reply. A great deal of testimony was received concerning the representations which were made, their falsity, and the reliance placed upon them by prospective participants.

On this appeal Irwin and Kerns first argue that there was insufficient proof of a scheme or plan to defraud. They review certain of the evidence pertaining to the nature of the M.O.D. operation and the representations which were made. They argue therefrom that the franchise holders received value for their expenditures and that the representations were either truthful or of a kind on which prospective participants were not entitled to rely, or that it was not shown that appellants were aware of the falsity of the representations. Kerns argues, independently, that whatever case may

have been proved against Irwin, it was not shown by substantial evidence that Kerns knowingly and intentionally participated in any such scheme to defraud or misrepresent.

It was incumbent upon the Government to prove beyond a reasonable doubt, as an essential element of the offense defined in 18 U.S.C., § 1341, that the transactions described in the indictment involved a scheme by Irwin and Kerns to defraud. See Bolen v. United States, 9 Cir., 303 F.2d 870, 874.

The representations referred to in the indictment were concededly made in connection with M.O.D.'s solicitation of business from prospective franchise holders. It follows that if those representations were shown, beyond a reasonable doubt, to have been knowingly false, or that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension, Silverman v. United States, 5 Cir., 213 F.2d 405, 407, the Government sustained its burden of proof as to the existence of the requisite scheme.

One kind of statement made by M.O.D. was that the franchises would be profitable.[3] There was abundant proof that the mail order business in which franchise holders engaged in strict accordance with the M.O.D. plan, was consistently unprofitable. The materiality of statements of this kind is self-evident since the only reason individuals and companies desired to become participants in the plan was to make a profit.

Appellants, however, argue that they cannot be held responsible with regard to statements of this kind because success depended entirely, at least at the outset, on the results to be obtained by franchise

3. Among the statements of this kind were the following:

"Lucky M.O.D. Import Franchise Holders are piling up substantial profits in ever increasing amounts."

"Had you grasped this opportunity when I first wrote you, it is true, you would have been hundreds of dollars richer by now—but it is *not too late* yet."

"You can count on an income which will pay for your Franchise in the first *few days* of your operation."

"It is a proven practical money-maker that you can use just as I do. * * *"

"Would you like to add $100, $500, or even $1,000 to your income every month? Let me tell you how *you* can do it."

"This Franchise is just like having a *license* to make big money!"

holders from the use of the mailing lists obtained from the William Strole Company. Strole is one of the oldest and best established suppliers of mail order lists. Any failure to obtain returns, appellants contend, rests solely with the lists themselves and not with M.O.D.

But the statements that profits would be realized were in no way conditioned or qualified. Prospective participants were entitled to assume therefrom that use of the lists in the manner specified by M.O.D. would produce profits.

■ Appellants further argue that statements as to profits which could be realized have to do with future expectations and were therefore not representations of existing fact concerning which the prospective purchasers were entitled to rely. Implicit in any such expression of opinion, however, is the representation of fact that such opinion is honestly entertained. See United States v. Rubenstein, 2 Cir., 166 F.2d 249, 255. The jury was here entitled to find that Irwin and Kerns had no basis in fact for believing that the business to be operated by the franchise holders would be profitable, and that appellants' expressed opinion to that effect was therefore not actually entertained, or at least not honestly entertained.

As appellants point out, the impracticability of a scheme is not alone sufficient to convict one of having devised a fraudulent scheme. See Turner v. United States, 8 Cir., 32 F.2d 126, 127. But the statement that a particular venture will succeed is at least a representation that the person making the statement believes that it is practicable. Having no basis for such a belief, Irwin and Kerns misrepresented what their opinion was as to the practicability of the business, or so the jury could have found.

As noted above, Kerns makes the additional argument that whatever case may have been proved against Irwin, it was not shown by substantial evidence that Kerns knowingly and intentionally participated in any such scheme. In this connection it is pointed out that it was Irwin who conceived the idea for the formation of M.O.D., and it was Irwin who prepared M.O.D.'s advertising literature. Kerns argues that with regard to the statements made concerning profits to be realized, the Government offered no evidence that he had any knowledge that the M.O.D. franchises were unprofitable. While conceding that numerous complaints were received, it was not established, Kerns asserts, that these complaints had reference to lack of profits, as distinguished from misprintings, delays in delivery and the like.

The evidence showed that Kerns had been employed by Irwin as general manager of M.O.D. In this position he had control of all operations. All of the materials which contained statements concerning prospective profits, sent to prospective franchise holders, were mailed by persons under his direction and control. Kerns admitted that all of the representations contained in the material were known to him and that he never objected to their inclusion. The representation that, in his honest opinion, the business of franchise holders would be profitable was therefore adopted by Kerns as his own.

■ Assuming that he did not know that Irwin did not honestly entertain this opinion, and that he had no actual knowledge that the facts would not justify such an opinion, Kerns at the very least acted with reckless indifference in adopting that opinion as his own. This is especially true in view of the relatively few repeat orders which were sent in. One who acts with reckless indifference as to whether a representation is true or false is chargeable as if he had knowledge of its falsity. See West v. United States, 10 Cir., 68 F.2d 96, 98.

Another kind of statement made by M.O.D. was that constant and consistent help and direction at all times from a permanent panel of mail order experts maintained and paid for by M.O.D. was available for advice to M.O.D. franchise holders. Along this same line, there were statements that constant encouragement and instructions on exactly how franchise holders may extend their ac-

tivities and increase their profits were available from the panel of experts.

Appellants argue that statements of this kind could not have provided a foundation for a jury finding that Irwin and Kerns had engaged in a scheme or plan to defraud, pointing to a comment by the trial court, out of the presence of the jury, discounting the significance of such statements.[4]

According to the circulars distributed by M.O.D., this three-member panel of experts was comprised of Kerns, C. J. Nowak and Harry A. Laufman, William Chamberlain or Mrs. Nelda Irwin. Nowak, step-father of Irwin, was eighty-three years old and ill. Laufman testified that at no time was advice sought from him as a panel member, that he received no pay and that he did not meet with other members of the panel. Chamberlain testified to the same effect and also testified that the statements in the circulars concerning his background were incorrect as he had had no sales promotion experience. Nelda Irwin is the mother of appellant Irwin. Two franchise holders testified that at several times they sought advice or information from M.O.D. but received no answer.

In view of this testimony and notwithstanding the comment by the trial court, the jury were entitled to find that the representations concerning the availability of a panel of experts were false representations calculated to deceive and, in fact, did deceive prospective franchise holders.

Another kind of statement made by M.O.D. was with regard to the "Ironclad Guarantee," which all franchise pur-

chasers enjoyed.[5] It was charged in the indictment that in giving this "guarantee" Irwin and Kerns wilfully concealed the fact that a franchise purchaser could not obtain a refund of the franchise purchase price unless and until the franchise purchaser paid the defendants an additional sum of money for materials. The evidence showed that refunds were usually not made on the purchase of the franchise for $29.95 unless the purchaser first bought at least one complete package set-up at a price of at least ninety dollars. The latter sum was in no event refundable.

Appellants argue that they did not conceal the necessity of making the additional ninety-dollar purchase in order to claim a refund of $29.95 on the purchase of the franchise. In so contending, appellants rely upon this statement in the guarantee:

"* * * after you have participated in your first Complete Package Set-up, if you feel that your earnings are not satisfactory, you may ask for, and receive at once, the full amount you have paid for your Franchise."

While refunds under this guarantee were not promised unless the purchaser had first "participated in your first Complete Package Set-up," it was not disclosed therein that such participation required the outlay of a substantial sum of money. Not until the $29.95 had been paid and a franchise and accompanying instructions had been received, were purchasers made aware that they would have to make additional expenditures. Many could not afford to make the

---

4. The trial court said, during the course of the trial:
   "I think this panel of experts and these lists are kind of things you could well avoid. I am not very much impressed with it, and if that is then all that they had in this case, I wouldn't even waste any time. I would direct a verdict in favor of the defendants if that was the case."

5. This "guarantee" read:
   "We want only satisfied, money-making Franchise Holders in our organization.

Therefore, after you have participated in your first Complete Package Set-up, if you feel that your earnings are not satisfactory, you may ask for, and receive at once, the full amount you have paid for your Franchise. We would rather refund your money and cancel your Franchise, at any time up to two months after granting it, than to hold you against your will. Only in this way can we be sure of a tight, happy group of co-operative, successful Franchise Holders."

additional expenditures and for that reason asked for a refund of the $29.95. These requests were uniformally denied unless handled by the Better Business Bureau. The nondisclosure referred to above therefore rendered the guarantee deceptive within the meaning of Silverman v. United States, 5 Cir., 213 F.2d 405. Many franchise purchasers were deceived thereby.

■ We hold that the evidence was sufficient to support the jury finding that appellants engaged in a scheme or plan to defraud.

The second general argument advanced by Irwin and Kerns on this appeal is that the record is devoid of evidence sufficient to establish venue in the Southern District of California, Central Division.

■ In view of the concurrence of sentences on the various counts, as set out in note 2 above, it is not necessary to determine whether the evidence as to venue was sufficient on each of the sixteen counts upon which convictions were obtained. If the evidence in this respect was sufficient as to any one of counts 1, 2, 3, 4, 5, 6, 7, 9 and 11, and as to any one of counts 14, 15, 16, 17, 18, 19 and 21, the lack of such evidence as to any other count would not be reversible error. See Brothers v. United States, 9 Cir., 328 F.2d 151, 157.

■ As to count 1, an envelope containing an initial package setup was received in evidence as exhibit 5. This envelope bears the return address of Mail Order Distributors, 15201 South Broadway, Los Angeles, California; is addressed to Miss Geneva Jack, 4778 67th Street, San Diego, California; and bears a metered postmark dated May 22, 1958, from Los Angeles. There was testimony by Miss Jack, who was the purchaser named in count 1, that she received exhibit 5 from M.O.D. after she had mailed her application and check in the sum of $29.95 to M.O.D. Appellants suggest no reason why this exhibit does not constitute adequate proof of venue as to count 1. On the contrary, the envelope bearing a metered postmark is

sufficient evidence to establish venue. See United States v. Cohen, 2 Cir., 145 F.2d 82, 89.

As to count 15, exhibit 14 consists of a typewritten form letter, dated April 14, 1960, from Mail Order Distributors, bearing a facsimile signature of Kerns, with the usual M.O.D. Los Angeles return address. The letter was addressed to A. Vartinian, 317 East 10th St., Oakland, California, and advises that M.O.D. is unable to cancel his franchise until after he has participated in his first complete package setup. Vartinian is the purchaser named in count 15. Stapled to the form letter is the envelope in which it was mailed, carrying M.O.D.'s Los Angeles return address and a metered Los Angeles postmark dated April 14, 1960.

Appellants argue that because the envelope stapled to the letter was not separately tagged or marked in evidence as an exhibit, it cannot be regarded as having been received in evidence. This contention is too frivolous to warrant discussion, especially in view of the fact that in testifying as to receipt of this letter, Vartinian made specific reference to the date on the envelope.

The evidence was sufficient on the question of venue to support the sentences imposed.

Appellants' third line of argument is that the trial court erred in overruling objections to two questions, made on the ground that the questions were leading, and an objection to the answer to one question, made on the ground that it went beyond the question.

■ One of the two questions objected to was possibly leading, but even so it was within the sound discretion of the trial court to allow it. That discretion was not abused. The answer objected to went beyond the question which was asked by the trial judge, but, at most, anticipated the next question which could properly have been asked. If there was any error with regard to these trial occurrences, it was not prejudicial.

Appellants next contend that there were "inherently erroneous" and prejudicial errors and omissions in the trial court's instructions to the jury. Specifically, appellants argue that the court erred in failing to give instructions concerning the burden of the Government to prove both intent and acts pursuant thereto, as set out in Nos. 4.01 and 4.02 of Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 75–76, and instructions concerning the necessity of determining the case of each defendant on the basis of the evidence applicable to his case, as set out in Nos. 8.08 and 8.10 of the same text, 27 F.R.D., at 96–97.

Our examination of the instructions convinces us that the trial court gave adequate and correct instructions on these matters.

Appellants argue that in the court's discussion of instructions prior to argument the court did not fully discuss all of the instructions requested or indicate all of the instructions which the court intended to give to the jury. Appellants claim error under Rule 30 which provides: "The court shall inform counsel of its proposed action upon the requests [requested instructions] prior to their arguments to the jury, but the court shall instruct the jury, after the arguments are completed." In support of this argument appellants cite Ross v. United States, 6 Cir., 180 F.2d 160, 165.

In Ross the defendants interposed a timely objection to the failure to comply with Rule 30; here the appellants did not. In Ross there is no indication that the defendants were told even generally about the contents of the instructions; here counsel were so informed. But assuming that there was a failure to comply with Rule 30 which can be noticed on review, no prejudice resulted, since we find no error in the giving or withholding of instructions, and it has not been indicated how counsel for appellants were hampered thereby in arguing to the jury.

At the oral argument in this court counsel for Irwin raised, for the first time, the question of whether incriminating statements or other evidence were elicited from him at a time when he was without the aid of counsel under circumstances constituting a deprivation of his rights under the Sixth Amendment. In raising the question counsel for Irwin sought to invoke the principles recently announced by the Supreme Court in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246.

In view of the constitutional nature of the question we granted the request of Irwin's counsel for an opportunity to file a supplemental brief. This brief, and the Government's answer were thereafter filed.

Irwin brings to our attention two occasions when, he suggests, his rights under the Sixth Amendment may have been violated. The first occurred when postal inspector Jacobson submitted by mail, in February, 1961, an M.O.D. coupon, giving his own name and post office box number, without identifying his occupation. In response to his request the inspector received from M. O. D. on March 6 and 27, 1961, the usual solicitation materials employed by M.O.D. in its endeavor to interest prospective franchise holders to purchase the franchise for $29.95. The inspector testified to these facts at the trial.

At that time neither Irwin nor Kerns had been indicted or arrested. The postal inspector was conducting an investigation to determine if appellants were engaging in an unlawful activity. The accusatorial stage of the proceeding had not yet been reached. This being true, the eliciting of the evidence described without revealing to appellants the identity of the investigator or advising them of their right to counsel, and without appellants then having the aid of counsel, was not violative of their rights under the Sixth Amendment, as construed and applied in Escobedo or Massiah or any other Supreme Court decision. Nor were they thereby denied any rights un-

der the Fourth and Fifth Amendments, invoked in appellant's supplemental brief.

The second occasion upon which Irwin relies in advancing his new argument involved a conversation which took place on March 3, 1961, in appellant's office building. Present, according to postal inspector Jacobson, were himself, postal inspector Frank Orr, Irwin, William Page and Henry Jungy, the latter identified to Jacobson as Irwin's counsel. During the conversation, Jacobson asked, and Irwin answered, specific questions relative to the operation of M.O.D. This was prior to the return of the indictment or the arrest of either appellant. At the trial a Government witness testified to this conversation.

As Irwin's counsel was present there is no factual basis for a claim that he was, on that occasion, deprived of the aid of counsel.

Affirmed.