782 F.Supp. 1382 (1991)
In re AMERICAN CONTINENTAL CORPORATION/LINCOLN SAVINGS AND LOAN SECURITIES LITIGATION.
Sarah B. SHIELDS, et al., Plaintiffs,
v.
Charles H. KEATING, Jr., et al., Defendants.
Charles ROBLE, et al., Plaintiffs,
v.
ARTHUR YOUNG & CO., et al., Defendants.
MDL Docket No. 834, Nos. CIV 90-566 PHX-RMB to CIV 90-570 PHX-RMB, CIV 90-574 PHX-RMB and CIV 90-1270 PHX-RMB.
United States District Court, D. Arizona.
December 12, 1991.
*1383 Leonard B. Simon, Kevin P. Roddy, Milberg Weiss Bershad Specthrie & Lerach, San Diego, Cal., for Shields.
Joseph W. Cotchett, Susan Illston, Allan Steyer, Cotchett, Illston & Pitre, Burlingame, Cal., and Ronald Rus, Alvarado, Rus & Worcester, Orange, Cal., for First Baptist.
Clayton R. Janssen, Janssen, Malloy, Marchi, Needham & Morrison, Eureka, Cal., for Ralph H. Rankin and Dorothy L. Rankin.
William B. Hirsch, Lieff, Cabraser & Heimann, San Francisco, Cal., for Judith Sims.
P. John Owen, Kristin L. Farnen, Nancy L. Shelledy, J. Emmett Logan, Morrison & Hecker, Phoenix, Ariz., for plaintiff Resolution Trust Corp. and defendant Lincoln Sav. and Loan Ass'n.
Stuart L. Kadison, George W. McBurney, Sidley & Austin, Los Angeles, Cal., for Arthur Andersen & Co.
Miles N. Ruthberg, Meryl Macklin, Laurence Popfsky, Heller, Ehrman, White & McAuliffe, Los Angeles, Cal., for Arthur Young & Co., Ernst & Young and Jack Atchison.
Wayne W. Smith, Gail E. Lees, James Behrendt, Byron Wilder, Gibson, Dunn & Crutcher, Los Angeles, Cal., for Touche Ross & Co.
Dan K. Webb, Thomas J. Frederick, Winston & Strawn, Chicago, Ill., for Lexecon, Inc.
Laura B. Hoguet, Joan Morgan McGiver, White & Case, New York City, and C. Randolph Fishburn, Katherine T. Haracz, White & Case, Los Angeles, Cal., for Bankers Trust.
Richard Sander, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, Minn., for Offerman & Co., Joseph Offerman and Scott Offerman.
Max Gillam, Brian Ropelle, Latham & Watkins, Los Angeles, Cal., for Jones, Day, Reavis & Pogue, William J. Schilling and Ronald Fein.
David J. Brown, Brobeck, Phleger & Harrison, San Francisco, Cal., for Indus. Indem. Corp.
Vincent E. Nowak, McKool Smith, Dallas, Tex., for Gene E. Phillips.
Henry C. Kasson, Taft, Stettinius & Hollister, Cincinnati, Ohio, for Star Bank, N.A., Cincinnati.
Steven M. Pincus, Lindquist & Vennum, Minneapolis, Minn., for First Bank Nat. Ass'n (formerly First Bank of Minneapolis).
Lisa Coulter, Snell & Wilmer, Phoenix, Ariz., for Troutman, Sanders, Lockerman & Ashmore.
Marvin G. Pickholz, Stroock & Stroock & Lavan, Washington, D.C., for Jack Atchison.

MEMORANDUM OPINION AND ORDER
BILBY, District Judge.
Under consideration are motions by Bankers Trust Company ("Bankers Trust") for summary judgment in two parallel consolidated class actions alleging securities fraud and racketeering under federal and state law. Class plaintiffs purchased securities issued by American Continental Corporation ("ACC"), parent company to Lincoln Savings and Loan Association ("Lincoln"). The ACC/Lincoln enterprise, headed by Charles H. Keating, Jr., has precipitated litigation against Keating, other ACC/Lincoln directors and officers, their lawyers, accountants, and business associates.

I.
Bankers Trust performed a variety of traditional and investment banking services for ACC/Lincoln. Plaintiffs allege that through its business dealings Bankers Trust knew that ACC/Lincoln was in "precarious financial condition," "was operating *1384 in an imprudent and fraudulent manner," and "was placing unsuspecting subordinated bondholders at ever-increasing risk." Yet despite this knowledge, Bankers Trust "provided ACC/Lincoln with financial assistance and non-routine banking services which enabled ACC/Lincoln to continue its operations and sell additional subordinated debentures." Class Plaintiffs' Memorandum in Opposition to Motion at p. 1. Plaintiffs complain that by propping the ACC empire up in this manner, Bankers Trust aided and abetted the primary fraud committed by ACC/Lincoln principals, who allegedly induced plaintiffs to purchase ACC's unsecured subordinated debt through an extensive scheme of misrepresentation about the soundness of both ACC/Lincoln and the investment bonds.
Plaintiffs contend that Bankers Trust violated Section 10(b) of the Securities Exchange Act of 1934; Sections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); the Arizona Racketeering Act, A.R.S. § 13-2301 et seq.; and California Corporations Code §§ 1507 and 25401. In addition, plaintiffs allege that Bankers Trust has aided and abetted and/or conspired in violations of the common law of fraud, negligent misrepresentation, and breach of fiduciary duty.
Plaintiffs assert that the evidence supports the following findings, precluding summary judgment:
1. In late 1985 or early 1986, Bankers Trust became aware that ACC/Lincoln was operating in an opportunistic, high risk, imprudent manner.
2. In 1986, Bankers Trust learned that ACC/Lincoln was selling subordinated debentures to buyers who were unaware of the true risks involved.
3. Despite its knowledge, Bankers Trust provided financing in late 1985 and again in 1988 which enabled ACC/Lincoln to continue its wrongdoing, including raising over $1 billion through various debt offerings.
4. In 1985, Bankers Trust helped ACC/Lincoln devise a financing mechanism to exploit ACC's employee stock ownership plan in a way which manipulated the price of ACC stock and benefitted ACC/Lincoln insiders.
5. Bankers Trust hired as a senior vice-president one Barbara Thomas, with knowledge that she was being paid by Keating. While at Bankers Trust, Thomas played a central role in the ACC/Lincoln account and exerted improper pressure on federal regulators on behalf of Keating.
6. Despite its knowledge that ACC/Lincoln had excessive junk bond holdings, Bankers Trust pressured Keating to make additional investments.
7. In October 1988, Bankers Trust knowingly assisted Keating in an unlawful stock manipulation to force short sellers out of the market.
8. Because of what Bankers Trust knew about ACC/Lincoln's financial condition, prudent banking practice required that it withdraw from all business relations. Nevertheless, it continued to provide an array of non-routine banking services.

II.
Rule 10b-5, implementing Section 10(b), provides in relevant part:
[i]t shall be unlawful for any person directly or indirectly ...
(a) To employ any device, scheme or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5.
In the Ninth Circuit, an aiding and abetting cause of action requires proof of the following elements:
(1) the existence of an independent primary wrong;

*1385 (2) actual knowledge by the alleged aider and abettor of the wrong and of his or her role in furthering it; and
(3) substantial assistance in the wrong.
Harmsen v. Smith, 693 F.2d 932, 943 (9th Cir.1982), cert. denied, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).
Proof of scienter is a requisite of any 10(b) action. Scienter has been defined by the United States Supreme Court as "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). In Hollinger v. Titan Capital Corp., 914 F.2d 1564 (9th Cir.1990) cert. denied, ___ U.S. ___, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991), the Ninth Circuit determined the degree of recklessness which will satisfy the scienter requirement, adopting verbatim the standard approved by the Seventh Circuit:
[R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.
Id. at 1569, (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044-45 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). Hollinger embraced the Seventh Circuit's explication that "the danger of misleading buyers must be actually known or so obvious that any reasonable [person] would be legally bound as knowing, and the omission must derive from something more egregious than even `white heart/empty head' good faith." Id. at 1569-70. The Hollinger standard is consistent with earlier Ninth Circuit pronouncements that "recklessness is a lesser form of intent rather than a greater degree of negligence." Hollinger, 914 F.2d at 1569 (citing Vucinich v. Paine, Webber, Jackson & Curtis Inc., 739 F.2d 1434, 1435 (9th Cir.1984).
The parties dispute the relevance of the Hollinger reckless scienter in the aiding and abetting context. Defendants contend the Harmsen "actual knowledge" requirement must be literally construed. As the Ninth Circuit has made clear, however, reckless scienter is a rigorous standard. It will not be satisfied where a defendant should have known with the exercise of due care. The securities laws are violated where a primary violation is known to the aider or abettor, or is so obvious that the actor must have been aware of it, and where the defendant's role in furthering that violation is known, or so manifest that the actor must have known his or her conduct was a contributing factor. As in the case of a primary violation, highly unreasonable omissions which constitute extreme departures from ordinary care may be evidence of the requisite recklessness.
The elements of aiding and abetting a RICO violation parallel those of section 10(b). See Oscar v. University Students Co-op Ass'n, 939 F.2d 808, 809 n. 1 (9th Cir.1991) (citing Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349 (3rd Cir.1987)). At a fundamental level, a racketeering cause of action requires proof of a specific intent to defraud. To prove racketeering based on mail or wire fraud, for example, it is necessary to show: (1) a scheme or artifice to defraud, (2) that the mail or wires were used in furtherance of the scheme, and (3) that this was done with a specific intent to deceive or defraud. 18 U.S.C. §§ 1341 and 1343. A defendant may not unwittingly aid and abet an act of racketeering. Like securities fraud, it requires a guilty mindset. The reckless scienter standard is therefore appropriately applied in this context as well.
To prove specific intent to defraud, a plaintiff must show that the "scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." United States v. Bohonus, 628 F.2d 1167, 1172 (9th Cir.), cert. denied, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980) (quoting Irwin v. United States, 338 F.2d 770, 773 (9th Cir.1964), cert. denied, 381 U.S. 911, 85 S.Ct. 1530, 14 L.Ed.2d 433 (1965)). This intention may be shown by examining the scheme itself. Id.
*1386 Similarly, with respect to violations of common law, California has adopted the Restatement 2nd of Torts § 876 formulation of aiding and abetting, which provides:
For harm resulting to a third person from the tortious conduct of another a person is liable if he (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.

III.
The facts in the record are largely undisputed. The parties dispute the inferences which may fairly be drawn from the facts. The extensive record is excerpted here only to highlight key items of proof.

A. Early Bond Issues
In 1984, Bankers Trust became acquainted with ACC/Lincoln through Merrill Lynch, Pierce, Fenner & Smith, who recommended it as trustee on ACC/Lincoln bonds issued for the European market (Euro I). Bankers Trust developed a "collateral swap" mechanism which facilitated ACC/Lincoln's contractual right to substitute pledged collateral.
After this first encounter, Bankers Trust acted as indenture trustee on several subsequent issues of notes for European-based purchasers, assuming administrative responsibilities to the noteholders while the notes were outstanding and in the event of default. These financings (Euro II, Euro III, and Euroyen) were underwritten by a French bank and were collateralized by mortgage-backed securities. When Lincoln was seized by federal regulators in April 1989, Bankers Trust foreclosed on the collateral and paid off outstanding notes pursuant to the trust indentures.
There is no evidence that Bankers Trust originated the financings or was aware of any wrongdoing by ACC/Lincoln with respect to them. Nor is there evidence that Bankers Trust collaborated with ACC/Lincoln to favor the European noteholders over the class plaintiffs when the notes went into default.

B. 1985 Financings and FRESOP
After the first Eurobond transaction, a young account manager named Rick Schwartz cultivated business with Keating, ultimately generating three transactions in which Bankers Trust acted as placement agent, trustee, and letter of credit bank for ACC/Lincoln. These included two bond issues through Bankers Trust's tax-exempt note rate program ("TENR"), an established financial vehicle to obtain long-term financing at low interest rates.
The third was a new invention developed by Don Collat, Vice-President in the Investment Banking Department. Collat anticipated that the 1984 amendments to the Internal Revenue Code would stimulate borrowing by employee stock ownership plans ("ESOP") and devised the "FRESOP" (for floating rate ESOP), which was similar to TENR, but capitalized on newly-enacted tax benefits for institutional lenders who financed ESOP purchases of company stock. ACC had expressed interest in leveraging their ESOP and was referred to Collat by Rick Schwartz. The transaction closed in November 1985, with Bankers Trust acting as placement agent, letter of credit bank, and indenture trustee for the note purchasers. Bankers Trust had played no part in designing the ESOP itself, nor did they decide how the note proceeds would be used. Bankers Trust did recommend that a larger FRESOP issue would be more marketable, but the evidence suggests no link between this advice and the nature of ACC's shareholders. The ESOP trustee, First National Bank of Minneapolis, notified Bankers Trust on December 9, 1985, that stock had been purchased with the note proceeds. An attachment indicated that the $5 million proceeds from the FRESOP Note Series A purchased 606,061 shares of stock from "various individuals" at 8¼ per share. Proceeds from Series B and C were used to purchase stock from a half-dozen brokers, including Drexel Burnham Lambert, Inc. Don Collat testified that he had a "vague understanding" of who the ACC shareholders *1387 were, and knew that there were "substantial holdings by managers of the company." He could not recall if he knew the names of the managers or whether they were Keating family members. He testified that he had known that Charles Keating, Jr. himself was a major shareholder.
The December 9, 1985 letter post-dates the development and closure of the ESOP financing and contains no specific information about the sellers. Overall, the evidence offers no support for the conclusion that Bankers Trust knew or should have known that ACC was using its ESOP to illegally manipulate the price of its stock.

C. Knowledge of Opportunistic, Imprudent Operations
After the 1985-1986 credit dealings, a series of in-house communiques document Bankers Trust's assessments of ACC/Lincoln as a credit risk.
A credit memorandum dated October 11, 1985 notes that when ACC acquired Lincoln in early 1984, the new Keating management team "ceased traditional S & L lending activities (such as financing residential real estate), in order to pursue other business initiatives which are more aligned with the business of ACC ... [including] the acquisition and development of real estate for resale, the origination of $5MM+ commercial and real estate loans and the management of a $300MM+ portfolio of equity and high yield real estate loans and securities."
A subsequent credit memorandum, prepared in April 1986 by a new account manager, Chris Levy, considered updated financial information. The conclusion: "The cyclical and unpredictable nature of Lincoln's core business, real estate development, requires that we closely monitor changes at the S & L, but our current credit exposure remains a prudent application of the bank's capital."
Soon thereafter, on May 23, 1986, Terence J. Mogan, the senior credit officer for the Corporate Finance Division in New York, wrote this to Los Angeles senior credit officer Charles Rullman:
You will recall that we deliberated long and hard over the size and nature of our exposure here given the ACC connection and the path this S & L was taking to the future. When I look at its balance sheet (asset composition) and the source of its profitability, I do not get a warm glow. They certainly are opportunistic and not in the least shy about mingling the thrift's business with that of the other ACC entities. This fluid approach to business has been cause for concern elsewhere and has served to hide problems and inflate earnings (First Oklahoma for example). We agreed to the later '85 L/C's with the proviso that:
(a) We would conduct an intensive analysis of the fiscal report when received  especially the real estate development piece.
(b) Collateral and covenant protection would be obtained.
(c) We would lighten up via syndication of the longer maturities.
Memo doesn't present the covenant triggers in the SPL/C's; do we have any?
Mogan went on to say:
Net interest margin stinks. Locking in money is great; Columbia does it well  these guys not so well. Given they are moving out of home mortgages  the possibility of rate declines on floating rate assets really could hurt them.
Debt components  the best assets are pledged to the FRN's and us (I hope); more to go vs. CP. They are not as liquid as they appear. What does their corporate/muni securities look like?
Mogan concluded: "Sorry for the questions but I get uncomfortable looking at a company in transition with a lot of open issues." Chris Levy, responded by suggesting syndication of Bankers Trust's exposure, but efforts to market ACC/Lincoln's letters of credit proved unsuccessful.
During 1986 there was concern in the Investment Banking Department as well. Collat testified that two factors changed his opinion of ACC/Lincoln in the fall of 1986. He had been unable to market a senior unsecured note offering, and he viewed with disfavor news reports that ACC/Lincoln had offered a consulting position *1388 to Federal Home Loan Bank Board Chairman Edwin Gray. Collat testified that his reaction to the news had been: "Negative if true ... I don't like that kind of activity. I just don't think it's good, if it's true."
Also in autumn 1986, and contemporaneous with publicity about Lincoln's dealings with regulators, Bruce D. Classon sent a message to Collat on the margin of a Securities and Exchange Commission ("SEC") Form 10-Q for the quarter ending June 30, 1986: "Suggest we start backing away from this situation  beginning to look funny." The memo also bore a post-it with a note by an unidentified author: "STAY AWAY."
And stay away they did. With the exception of a four-day bridge loan in 1988, Bankers Trust provided no additional credit to ACC/Lincoln. In the context of the entire record, these comments can reasonably be viewed only one way  as the reactions of an external observer and arms-length creditor to financial statements and controversial news reports. There is no evidence that Bankers Trust had any hands-on involvement with or inside information about the operation of ACC/Lincoln.

D. Knowledge of Subordinated Debt Sales
The record shows only that Bankers Trust reviewed ACC's June 1986 and July 1988 prospectuses. Mogan and Levy testified they learned at some point that ACC/Lincoln was selling subordinated debt but neither was involved with or had specific information about the marketing strategy or targeting.
For example, Levy testified that in fall 1986 he read in the newspaper that ACC was selling subordinated debentures to the public. He said the news affected his view of his client's liquidity. "I felt it would be difficult for them to go to the market with that kind of an issue ... Looking at it strictly as a lender, we were a secured lender. That's an unsecured issue. I thought that would be ... a tough sell for the market to accept." Although Levy knew the offering was public, he testified that he did not know whether the marketing was directed at sophisticated or unsophisticated investors.

E. Barbara Thomas
Barbara Thomas began at Bankers Trust in August 1986. She had been a partner at the New York law firm of Kaye, Scholer, Fierman, Hays & Handler (Keating had been a client), and an SEC commissioner. She was employed by Samuel Montagu, Inc., a Hong Kong-based investment bank, when she was recommended by a personal acquaintance on the Bankers Trust board who had no relationship to ACC/Lincoln. The evidence is that she was highly respected and well-connected, in both foreign and domestic arenas, and was hired by Howell Scott, who headed Bankers Trust's Private Clients Group. Her position as senior vice-president of the International Private Banking Group involved providing banking services to foreigners in the United States. The uncontroverted evidence is that Thomas told Scott about her consulting relationship with ACC when he hired her, but no details were discussed. The subject arose when Scott encouraged Thomas to move up her start date, and she said she had things to finish up, including her consulting responsibility to ACC. He told her that wouldn't be a problem, she testified, and even suggested she become an ACC/Lincoln board member. She testified that, other than Scott, she never told anyone at Bankers Trust of her consulting relationship, and the testimony was consistent that no one else at Bankers Trust was aware of it.
She testified that she did not tell anyone at Bankers Trust that she received a $500,000 one-time consulting fee from ACC/Lincoln. Nor did she mention that she had borrowed approximately $200,000 from ACC/Lincoln. She revealed neither on Bankers Trust's annual disclosure forms. Her testimony was that she did not consider ACC/Lincoln to be a client of Bankers Trust.
The testimony was consistent that Thomas stated when apropos that she was Keating's friend. She testified that she made introductions for Keating, some on Bankers *1389 Trust letterhead because, she said, it was the only stationery her secretary had. She exchanged brief correspondence with Keating, commenting about the unfairness of the regulators' investigation and discussing her loan. She made several phone calls to regulators, including one to an SEC official, and two to Danny Wall during his tenure as Chairman of the Federal Home Loan Bank Board. She told them she knew and respected Keating and hoped they would give him a fair audience, and they said they would. There's no evidence that these calls were prompted by or made with the knowledge of Bankers Trust, and no evidence that they produced any significant result.
In late 1987, over a year after coming to Bankers Trust, she asked the head of the Corporate Finance West Coast Division to let Keating present his story, as he had been unhappy with the response he was getting from the bank. An interdepartmental meeting was convened on October 15, 1987. Thomas did not attend. After the meeting, the earlier decision not to extend additional credit was reaffirmed. Terence Mogan summarized the meeting:
I came away convinced that this is a name that would require very close following ... since "opportunism" seems to play a large role in what they undertake. The projected environment will affect ACC and Lincoln in a variety of ways  most of them in a negative fashion. Suggest we can make a lot of money here but they are likely to be "newsworthy" for quite some time. The land and [Drexel Burnham Lambert] connection also says that they might not have as much operating flexibility in a downturn as we would like.
Thomas effected no change in Bankers Trust's lending pattern. There is no evidence that Bankers Trust collaborated with Barbara Thomas to promote any common agenda involving ACC/Lincoln. Her actions on behalf of Keating while at Bankers Trust were on her own initiative and were of little consequence. To the extent some of her actions were within the scope of her Bankers Trust responsibilities, they were insignificant for purposes of the claims asserted here.

F. 1988 Private Placements
During late 1987 or early 1988, Barbara Thomas introduced Keating to Charles A. Quattrochi, of Bankers Trust's Private Equity Group. He testified that it was the first time he had heard of Keating, and that he had no knowledge of Thomas's consulting relationship. Quattrochi was a private placement agent, locating corporate financial sponsors. Keating shared an interest in these investments, and Quattrochi and others at Bankers Trust acquainted Keating's staff with various securities, eventually consummating three transactions. The evidence is that the bank's promotion with respect to these deals was professional and entirely arms-length. The evidence underlying plaintiffs' claim that Bankers Trust pressured Keating into engaging in junk bond deals is that Keating had "circled" (verbally committed to) a specific amount in one transaction, and had then backed away from it. Quattrochi testified that he contacted Keating after the latter avoided bank personnel who were attempting to close the transaction, and after he discussed the situation with Barbara Thomas, who said the reaction "did not sound like" Keating. Quattrochi found that Keating was upset with the bank's response in a matter related to his Phoenician Resort. Quattrochi testified that he "walked him through what a circle meant," and Keating agreed to do the deal, but said he wanted better treatment from the bank. The record supports only the conclusion that Bankers Trust's involvement with ACC/Lincoln was characterized by neutral investment banking interaction.

G. Custody and Deposit Accounts and the Short Squeeze
Beginning in 1985, ACC/Lincoln opened a variety of custody and deposit accounts. The accounts held cash, and mortgage-backed and other securities which were traded in the ordinary course of business. Account instructions were conveyed directly from the account-holder via electronic *1390 terminals, by fax, or by phone. Plaintiffs contend that in November 1988 Bankers Trust assisted Keating in manipulating securities in the accounts to halt short sales,[1] in violation of federal securities laws.
The evidence is limited to the account transaction slips, which are offered as proof of mail and wire fraud, and the deposition testimony of Richard Quintal, who in September 1988 became senior credit officer for the Fiduciary and Securities Department. He testified that he learned through increasingly negative publicity and in-house sources that there was growing concern that the ACC entities might not be able to meet their day-to-day account obligations. In his file was a copy of a Forbes Magazine article dated December 26, 1988, entitled "Mr. Keating, Meet Mr. Short." His undisputed testimony was that he first learned of the so-called short-squeeze through this article, which he himself clipped because it bore on the financial well-being of a client. With respect to the short-squeeze, he said in retrospect: "No one told me that there was anything unusual going on as far as the way that the ACC entities used the accounts. I think I would have been told if there had been."
The entire record shows only that Bankers Trust followed operational instructions from its customer. There is no evidence of recognition of the motivation behind the transfers, participation in planning the transfers, or awareness that the transfers signalled wrongdoing.

H. Late 1988
On October 3, 1988, Patrick Constantinides, credit officer in the Sales & Trading Department has this to say:
Andy Chacos is very keen that we should develop a meaningful relationship with this name ... [He] believes that there is a great deal of business that he can do with American Continental and its subsidiaries, not only through traditional risk arbitrage but also through structured financial engineering products ... American Continental acquired Lincoln Savings before deregulation and following deregulation put most of its operations under the umbrella of the thrift. With the reintroduction of regulatory controls, American Continental is restricted in what it can do ...
American Continental consists of several highly skilled entrepreneurs who source money from the cheapest source and use it in whatever area they can to make money. The source happens to be a savings and loan institution.
If we can properly relationship manage the name and effectively structure deals with the minimum of risk, we should be able to benefit handsomely ... It is a risk taker and how do we structure our facilities to effectively protect ourselves? The relationship manager must be in constant touch with the principals so that we are abreast of what is going on at all times. There is too much controversy surrounding this name and it skates too close to the wind for us to be long out of touch ...
Constantinides concluded: "I do not believe that we have the necessary skills nor the time to do this in Global Markets Credit." He testified that he wrote the memo to "make sure we weren't dealing with Mr. Chacos any more on this issue." Despite Chacos' persistence, Constantinides did not think ACC/Lincoln was a suitable customer for his Global Markets division, whose job it was to trade foreign securities and currencies. He believed this was too far afield from the traditional S & L role, which he viewed as accepting deposits and making home loans. He recalled no action having been taken in response to his memo. He testified that Andrew Chacos was "high on a great number" of thrifts, and was not pushing Lincoln any harder than the others. Constantinides commented: "There isn't ever much business to do out in L.A. and he was keen to do whatever he could."
In 1988, Bankers Trust made a fully secured, bridge (short-term) loan to ACC to enable it to purchase notes. The testimony *1391 was that the loan was approved to oblige Chacos's department, a way the bank could accommodate a client with whom that branch was dealing while incurring little credit exposure.
Typical of growing concern about the viability of ACC/Lincoln was an annotation on the margin of an SEC Form 10-Q for the quarter ending on September 30, 1988. Chris Levy remarked, with respect to an assertion of $81 million profit on an asset exchange, "You've got to be kidding." Annotated elsewhere on the 10-Q were the comments: "Losses are real!!" and "Not cash. Owed elsewhere."
The evidence shows that as 1988 drew to a close, increasingly negative publicity about ACC/Lincoln caused Bankers Trust to review all ACC/Lincoln accounts to ensure they held adequate security, and to consider closing the accounts entirely.

IV.
Dispositive of all claims is what Bankers Trust knew about ACC/Lincoln, and their legal responsibility in the face of that knowledge.
Plaintiffs' experts conclude, based on the evidence summarized here and other consistent evidence in the record, that Bankers Trust should have terminated business with ACC/Lincoln when it decided not to extend additional credit. Because Bankers Trust discerned the severity of ACC/Lincoln's financial instability, it must have known that by selling subordinated debt, it was preying on an unsuspecting public. In failing to take action, Bankers Trust knowingly assisted ACC/Lincoln's wrong.
These conclusions are not sustained by any reasonable interpretation of the evidence as a whole. Bankers Trust knew that ACC/Lincoln was a nontraditional savings and loan, not unlike others in the mid-1980's. They viewed as opportunistic and risky ACC/Lincoln's ventures into profit-making opportunities outside the conventional expertise of savings and loans, but theirs was as much general apprehension about the direction certain elements of the industry were taking as specific anxiety about ACC/Lincoln. They knew ACC/Lincoln was heavily involved in real estate, but there was the countervailing factor that Keating purported to have particular expertise in the Arizona real estate market. They knew that ACC/Lincoln was involved in a newsworthy struggle with the Federal Home Loan Bank Board, which would one day appear to be resolved, only to begin anew.
The evidence paints a consistent picture that Bankers Trust's perspective on ACC/Lincoln was that of an arms-length creditor, conducting thorough lending analyses, and reacting to public financial statements and news reports. Its financial assessments were sophisticated, its internal dialogue spirited. The tension between the conservative credit wing of the bank, and the more risk-tolerant investment banking function, is not at all surprising. Nor is the tension between eager newcomers anxious to prove their mettle, and more experienced credit officers responsible for oversight.
The evidence does not reasonably support the conclusion that Bankers Trust did wrong, knew or recklessly disregarded that ACC/Lincoln was doing wrong, or had information from which it should have concluded that ACC/Lincoln was doing wrong. There is no evidence that Bankers Trust had any specific information about the bond sales or colluded with respect to them. There is no evidence that Bankers Trust made representations, misleading or otherwise, in connection with ACC/Lincoln or its sales of securities. There is no evidence that Bankers Trust knew that ACC/Lincoln was committing a fraud through its bond sales program, nor that Bankers Trust provided financial wherewithal to ACC/Lincoln in flagrant disregard of information from which it had to have known, or should have known, that ACC/Lincoln was violating the law. There is no evidence whatsoever of a perception within Bankers Trust that it might be contributing to a fraud on the investing public.
To impose a legal duty on the facts in this record would be to turn every creditor into an investigatory agency. The law does not extend nearly that far.
*1392 Having thoroughly examined the record, and having viewed the facts therein in the light most favorable to class plaintiffs, the court finds no reasonable construction of the evidence which supports the claims made against Bankers Trust, and no question of material fact for determination at trial.
Therefore, it is ORDERED that Bankers Trust's motions for summary judgment in these actions are GRANTED. Accordingly, final judgment shall be entered in favor of Bankers Trust. Each party shall bear their own costs.
NOTES
[1] A short sale is a standard market practice in which brokers, in contemplation of negative developments, "sell" borrowed shares, with the hope they will profit by repurchasing the shares at lower prices.